UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TRANS-AUDIT, INC.,
     a New York corporation,

     Plaintiff,

                                 Case No.

v.

CONDATA GLOBAL, INC.,
     a Delaware corporation,

     Defendant.

_____/

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

     Plaintiff Trans-Audit, Inc. ("Trans Audit") sues Defendant Condata Global, Inc. ("Condata") and states:

## PRELIMINARY STATEMENT

     1.     Plaintiff Trans Audit, a leading provider of post-payment transportation audit—cost management services, brings this action against Condata, its direct and primary competitor in the highly competitive and specialized post-payment transportation audit industry. In 2019, after its attempt to acquire Trans Audit failed, Condata solicited Kristy Bishop ("Bishop")—Trans Audit's Director of Sales & Marketing who knows its confidential, proprietary and trade secret information—and hired her as Condata's Vice President of Business Development & Strategy to

compete directly and unfairly with Trans Audit, knowing that Bishop had a noncompete agreement with restrictions on non-solicitation and confidentiality.

2.    After Condata offered to hire her, Bishop submitted her two-week notice of voluntary resignation to Trans Audit and repeatedly lied and falsely assured Trans Audit that her new employer was not a competitor, in order to take Trans Audit's confidential, proprietary and trade secret information and use them for her new employer Condata.

3.    Just days before leaving her employment with Trans Audit on October 18, 2019, Bishop (a) surreptitiously accessed Trans Audit's servers, files, programs and client relationship management software containing its confidential, proprietary and trade secret information including but not limited to Trans Audit's client and prospective client lists, client contracts, client communications and reports, pricing information and sales and marketing information; (b) connected multiple personal and nonwork USB/external storage devices to her Company-provided laptop computer; (c) installed or updated a personally owned cloud-based file sharing software Dropbox; (d) copied, downloaded or transferred Trans Audit's confidential, proprietary and trade secret information to her personal devices, personal email and Dropbox or similar file sharing account; and (d) installed and utilized highly effective anti-forensic software in an attempt to wipe and hide, permanently delete

and prevent the recovery of her unlawful, nefarious and unauthorized computer activities.

4. Condata knew of and substantially assisted or encouraged Bishop's improper and unauthorized conduct and activities before she left Trans Audit's employment, which were intended to benefit and did benefit Condata. Moreover, Condata, knowing that Bishop took Trans Audit's confidential, proprietary and trade secret information by improper means, knowingly and willfully took, received and used said information. Condata, through or in concert with Bishop, has tortiously interfered with Trans Audit's clients and prospective clients; has engaged in unfair competition; and has caused harm to Trans Audit.

5. Trans Audit has a separate pending action against Bishop in Florida state court for breach of contract and misappropriation of Trans Audit's trade secrets among other things.

## NATURE OF THE CASE

6. This is an action for injunctive relief and for damages in excess of Seventy-Five Thousand Dollars ($75,000) against Defendant.

## PARTIES

7. Plaintiff is a New York corporation with multiple places of primary operations throughout the state of Florida including in Alachua County, Florida where Plaintiff's President and Chief Executive Officer ("CEO") Chad W. Kennedy,

3

IV—to whom Bishop reported—works and resides. Plaintiff also has operations in New York and a global presence in Europe, Singapore and China.

8.    The center of Trans Audit's operations and delivery services are in Florida and has been for over fifteen years.

9.    Defendant is a Delaware corporation with its principal place of business in Oak Brook, Illinois.

10.    In 2020, Defendant filed with the State of Florida Department of State, Division of Corporations, an application to transact business in Florida.

11.    Defendant has maintained a physical office located at 17251 Alico Center Rd Unit 3, Fort Myers, Florida 33967 for years and has continuously and substantially transacted business in Florida out of its Fort Myers office and/or other locations throughout Florida since at least 2004.

12.    Defendant's employees who perform work and transact Defendant's business in Florida include operational and managerial employees such as Executive Director, Key Account Managers, Senior Auditors and Freight Rate Analysists.

<u>JURISDICTION & VENUE</u>

13.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00 excluding interest and costs.

14.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, Defend Trade Secrets Act, 18 U.S.C. § 1836(b). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1)(a)(1), (2) and (6) because the causes of action against Defendant arise from Defendant committing a tortious act which has caused injury to Trans Audit in this state; from Defendant operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state; and from Defendant causing injury to Trans Audit in this state while Defendant is engaged in solicitation or service activities in this state.

16.     Personal jurisdiction is also proper pursuant to Fla. Stat. § 48.193(2) because Defendant, which has continuous and systematic business contact with Florida, is engaged in substantial and not isolated activity within this state.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Alachua County within this judicial district.

FACTUAL ALLEGATIONS

**Trans Audit is a Global Leader in Post-Payment
Transportation Audit—Cost Management Services**

18.    Trans Audit has provided expansive and comprehensive global freight

and parcel post audit and contract review services to hundreds of Fortune and Global

1000 corporations for over 40 years.

19.    Trans Audit's post audit services cover global, international, domestic,

inbound and outbound freight, parcel, processing, and logistics charges for all modes

of transportation (e.g., air, rail, ocean, barge, tank, bulk, truck) throughout the world.

20.    Trans Audit uses its transportation post audit expertise and leading-

edge electronic processing systems and analytics to review, identify and recover

overbillings, erroneous billings and overpayments of transportation costs for its

clients.

21.    Trans Audit also provides secondary post audit services which

consistently leads to the recovery of more overpayments and more cost reduction

opportunities than the clients' first post auditors, which are competitors of Trans

Audit. Trans Audit specifically utilizes second post audits as a strategy to gain

business from its competitors.

22.    Trans Audit delivers and has delivered highly proprietary, competitive,

and customized transportation post audit—cost management services to its clients

through its valuable confidential business information including but not limited to

6

its techniques, trade secrets, know-how, marketing strategies and development, pricing, pricing methodologies and limitations, product development, strategic plans, data, financial information and business plans.

23.     Virtually all of the company's trade secrets and highly confidential and proprietary information, including the company's sales, marketing and pricing strategies and information collected and compiled concerning prospective clients (also referred to as "prospects"), are stored and maintained at one or more of Trans Audit's four managing offices in Florida including the Gainesville office. Trans Audit's sales, marketing and operational information is stored on the servers located in Florida.

**Trans Audit uses Noncompete Contracts for Key Employees in this Highly Competitive and Specialized Market**

24.     Trans Audit uses noncompete agreements with its employees who are key members of the company, including top-level marketing directors or managers, to protect its legitimate business interests including its confidential information, trade secrets, specialized training and substantial relationships with prospective or existing clients, from misappropriation and unfair use by competitors. Bishop freely, knowingly and voluntarily accepted these provisions.

25.     Trans Audit's employees are hired, retained and compensated, in part, for making the non-compete commitment.

**Bishop was Trans Audit's Director of Sales & Marketing
and Signed a Noncompete & Non-Disclosure Contract**

Bishop Brought No Experience, Training or Clients to Trans Audit

26.   Bishop began working for Trans Audit as Client & Market Development Manager (later retitled to "Director of Sales & Marketing") in December 2015.

27.   Bishop reported directly to Kennedy, Trans Audit's President and CEO and Trans Audit's Senior Vice President of Sales & Marketing Vikki L. Van Vliet.

28.   Bishop's Director of Sales & Marketing position was a critical position that handled all aspects of developing and executing sales and marketing operations and strategies to Trans Audit's clients and prospective clients globally and nationwide.

29.   When Trans Audit hired her, Bishop was unemployed and had been terminated from her prior employment.

30.   Prior to working for Trans Audit, Bishop had worked as a telemarketer, had no direct sales or marketing experience and no experience in the transportation post audit industry. Bishop's experience was limited to cold calling prospective clients and establishing meetings for sales personnel to subsequently sell pre audit services (i.e., the receipt, processing and payment of transportation bills) which is a separate and distinct line of business from Trans Audit's post audit business.

### Bishop Signed the Contract Knowingly and Voluntarily

31.    On December 11, 2015, Bishop freely, knowingly and voluntarily signed an Employment Agreement (herein the "Contract") which, for two years following separation from employment expressly prohibits her from (1) directly or indirectly, on her behalf or on the behalf of any other person or entity, engaging in a business that is similar to Trans Audit's cost management business which is transportation post audit and/or (2) soliciting Trans Audit's clients, prospects or staff or hire its employees.

32.    The Contract permits Bishop to use her pre-audit experience after her employment with Trans Audit, without restriction, as Trans Audit does not offer pre-audit services.

33.    In the event of a breach of the Contract's non-compete and non-solicitation provisions, the Contract entitles Trans Audit to injunctive relief and damages including liquidated damages in the amount of all revenues derived from Trans Audit's clients and prospects in breach of the Contract. Trans Audit is further entitled to an accounting of all earnings, profits or other benefits acquired by Bishop as a result of any such breach.

34.    The Contract also prohibits Bishop from, at any time, directly or indirectly using, divulging, communicating or disclosing to a third party any of Trans Audit's confidential information for any purpose. Confidential information is

9

broadly defined in the Contract to include, without limitation, clients, client names, ideas, concepts, techniques, trade secrets, know-how, computer programs and records, marketing strategies and development, pricing, product development, strategic plans, software design and/development documents, source and object code, files, tapes, diskettes, data, reports, research, business plans, financial information and intellectual information (described in paragraph 10 of the Contract) and other information/documents which give Trans Audit a competitive advantage over its competition.

35.    Further, the Contract requires that Bishop upon separation from employment immediately (1) return to Trans Audit its confidential information and/or intellectual property, in whatever form, which remain in her possession or control, including without limitation all electronic files, copies and reproductions, and all compilations, summaries or other work papers, (2) return to Trans Audit its equipment and software in good working order with all peripherals and electronic and program files intact and (3) cease and desist from using all Trans Audit information, programs and auditing tools or copies thereof and return such information, programs and tools, including all copies, to Trans Audit.

36.    Bishop had every opportunity, and was encouraged, to seek legal advice before signing the Contract with Trans Audit.

37.    The Contract was executed by Kennedy in Alachua County.

38.    Appended hereto as Exhibit 1 is a true and correct copy of the Contract executed by Bishop.

**Trans Audit Gave Bishop Specialized Training, Confidential, Proprietary and Trade Secret Information, and Clients and Prospects**

39.    During her employment with Trans Audit, Bishop reported to and regularly and directly worked with Kennedy and Van Vliet.

40.    Kennedy and Van Vliet provided Bishop specialized, individualized and direct training in post audit services and outside sales. The specialized, individualized, and direct training provided to Bishop by the top executives of the company Kennedy and Van Vliet was based on decades of combined experience, best practices and know-how specific to Trans Audit and the post audit industry and outside sales in the highly competitive and specialized post audit market.

41.    Bishop's specialized, individualized, and direct training was conducted on an on-going and recurrent basis throughout her employment, both remotely out of Defendant's offices in Gainesville, Florida and elsewhere and in-person at Defendant's offices in Apopka, Florida and Hollywood, Florida where Bishop spent an extended period of time. Bishop also traveled with Kennedy and Van Vliet to develop relationships with and meet with prospects and clients in Florida and elsewhere, and received ongoing face to face training, sales training, client and prospect interaction tactics, meeting etiquette, and market strategies.

42.    During her employment with Trans Audit, Bishop received and had access to Trans Audit's trade secrets and valuable proprietary and confidential business information including but not limited to Trans Audit's strategic marketing plan, data base of clients and prospects which was created as part of its strategic marketing plan, pricing strategies, pricing limitations, most favored nations clauses with clients, market analyses, forecasts, sales, trends, training materials, competitive differentiators, know-how and best practices which give Trans Audit a competitive advantage over its competition.

43.    During her employment with Trans Audit, Bishop had numerous recurring strategic and planning meetings with the company's high-level employees and executives including with Kennedy and Van Vliet, which planned and discussed the discrete details of the company's operations, proprietary processes, competitive differentiators, marketing, and pricing strategies and plans among other things. These high-level meetings included regular bi-weekly sales meetings with Kennedy and Van Vliet which discussed specific marketing strategies and other strategic and proprietary business information provided only to high-level employees. Bishop also participated in annual review meetings with Van Vliet which planned and discussed specific marketing strategies, plans and goals for the upcoming year.

44.    During her employment with Trans Audit, Bishop had access to Trans Audit's internal Sales drive or folder which was housed in Trans Audit's offices in

Florida, and which contained valuable confidential information about Trans Audit's marketing documents, sales strategies and tactics, clients, and prospective clients.

45.    During her employment with Trans Audit, Bishop received and was provided access to and relationships with Trans Audit's clients and prospective clients, in addition to valuable confidential information about them.

46.    During her employment with Trans Audit, Bishop received discrete and specific information and strategies related to Trans Audit's business and marketing plans for its second post audit services including specific plans to solicit and offer second post audit services to a number of Condata's existing clients.

47.    During her employment with Trans Audit, Bishop received and gained direct access to clients and prospective clients at the highest level by participating alongside Kennedy and Van Vliet in telephone calls and meetings with clients and prospective clients.

48.    During her employment with Trans Audit, Bishop called on and served clients and prospective clients in Florida and elsewhere throughout the United States.

49.    During her employment with Trans Audit, Trans Audit made a substantial investment in terms of training, time and resources in Bishop and the development of Bishop's position as a top-level sales and marketing director.

50.    Trans Audit promoted Bishop in its written marketing materials and industry newsletters; paid for Bishop to attend numerous industry conferences and

13

marketing events all around the country to represent Trans Audit to clients and prospective clients; paid for membership in global, national, and local industry associations; and enabled Bishop to develop substantial relationships with clients and prospective clients.

### Condata is Trans Audit's Only Global Competitor and Primary National Competitor and Unsuccessfully Sought Merger with Trans Audit in 2019

51.    Condata is a direct and primary competitor engaged in the same line of transportation post audit business as Trans Audit.

52.    Condata is Trans Audit's only global competitor in this niche industry with the remaining post-audit competitors—about only five (5)—competing only on a national level and on a much smaller scale.

53.    Currently and at all times relevant, Condata offers and has offered only post audit services (not pre-audit service), like Trans Audit.

54.    In 2019 and at other times, Condata described itself on its website as a provider of "post audit freight bill services," "post audit and recovery services," "post audit business" services, and "post audits across all transportation modes" and having a "Singular Focus—Freight post audit is, and always has been, our only service offering. All of our staff, technology and focus is dedicated to your freight audit."

55.    Appended hereto as Composite Exhibit 2 are true and correct copies of information posted at Condata's website identifying the services mentioned in the paragraph above.

56.    Condata's website has changed and evolved after it hired Bishop in late 2019 and now looks more similar than before to Tran's Audit's website. Its primary services are still freight post audit services, like Trans Audit.

57.    In or around October 2018, NextGen Growth Partners ("NextGen"), a private investment firm based in Chicago, purchased Condata.

58.    In early 2019, NextGen and Condata, through Condata's then CEO Dave Newberry, broached the topic of NextGen purchasing Trans Audit and merging with Condata to Kennedy. Kennedy told Newberry on multiple occasions that Trans Audit was not interested.

59.    Nevertheless, Newberry pursued the opportunity through September 2019 and emailed Kennedy on September 13, 2019:

> Just to call it out – I'm sure that it seems inauthentic (or just plain annoying) for a direct competitor to reach out to you directly the way that I have. Knowing that, I truly appreciate the openness that you've afforded me in even entertaining a future conversation.

60.    Attached hereto as Exhibit 3 is a true and correct copy of the September 13, 2019 email from Newberry to Kennedy.

61.    By way of a letter dated September 20, 2019 to Kennedy, Newberry further pursued NextGen's desire to acquire Trans Audit and have Condata merge with Trans Audit and stated, in part:

> … I've come to believe that Trans Audit and Condata can do more to serve our clients and expand the market together than each company can do alone.
> Would you all be against having a discussion of how a merger between our companies could provide significant value to our customers, employees, and equity partners?
>
> We can structure a transaction to work for each of you. I know that partners can have different desires for near-term liquidity and different visions of what their specific operating roles in a company look like after a deal. With our base of long-term capital, we can customize a transaction to meet each of your needs and visions. For example, while Trans Audit and Condata together will be a strong, long-term investment, we would be happy to facilitate a merger through all cash, all stock, or a mix of cash and stock consideration, depending on your requirements.
>
> Trans Audit and Condata are a perfect strategic fit within the industry.
> …

62.    Attached hereto as Exhibit 4 is a true and correct copy of the September 20, 2019 letter from Newberry to Kennedy.

63.    Kennedy again told Newberry that Trans Audit had no interest in being bought out by NextGen or merging with Condata.

16

**After its Failed Attempt to Acquire Trans Audit,
Condata Solicited Bishop to Work for Condata**

Condata Wanted Trans Audit's Business and Trade Secrets

64.    Condata—knowing that Trans Audit was rejecting the acquisition forays—simultaneously and actively recruited Bishop in an attempt to unfairly compete with Trans Audit, to acquire Trans Audit's confidential, proprietary and trade secret information as well as Trans Audit's clients and prospects, and to take and undermine Trans Audit's business.

65.    Specifically, Condata's Executive Vice President of Sales & Marketing, John Vincent, directly and repeatedly contacted and solicited Bishop for employment with Condata from at least May 2019 through August 2019.

66.    In late September 2019, right after Kennedy shutdown Condata's acquisition plans and aspirations, Condata made a formal offer to employ Bishop as Vice President of Business Development and Strategy, a position which would inevitably involve Bishop using Trans Audit's confidential, proprietary and trade secret information, substantial relationships with clients and prospects, goodwill and specialized training, in order to develop Condata's business and strategies and expand Condata's client base.

67.    Moreover, Bishop had specific knowledge of Trans Audit's business plans and strategies to solicit and offer second post audit services to a number of Condata's existing clients, the disclosure of which would inevitably give Condata

17

an opportunity to shore up its relationships with those clients and decrease the chances of Trans Audit successfully competing for those clients.

68.    Prior to offering to hire Bishop, Condata was aware of Bishop's Contract with Trans Audit including Bishop's non-compete, non-solicitation and confidentiality obligations and yet intentionally and willfully disregarded said contractual obligations.

69.    Upon information and belief, Condata induced and encouraged Bishop to ignore and breach her contractual obligations and become employed with Condata and provided assurances that Condata would provide her with legal assistance and defense should Trans Audit seek an action against her.

#### Bishop Voluntarily Quit and Lied about her Next Employment

70.    On October 7, 2019, after years of working for the company and having received and gained access to Trans Audit's legitimate business interests, Bishop notified Trans Audit that she was voluntarily quitting her employment with Trans Audit, effective Friday, October 18, 2019.

71.    Before Bishop left employment with Trans Audit, Trans Audit asked her multiple times where she would be working and what she would be doing. Bishop refused and failed to identify her subsequent work-related arrangements despite repeated requests by Trans Audit.

72.    Instead, Bishop knowingly and intentionally misled Trans Audit and provided false assurances and lied to Trans Audit by claiming her new employment had nothing to do with Trans Audit's line of business and was specifically not a competitor of Trans Audit or a transportation post audit company.

73.    Specifically, at the time of her resignation, Kennedy reminded Bishop of her obligations to comply with the non-compete, non-solicitation and confidentiality provisions of the Contract. Bishop falsely assured Kennedy and lied to him that she was not going to a competitor, was taking on an "operational role" with another company and would not be involved in selling or engaging in post audit services.

74.    Bishop also provided false assurances and lied to Van Vliet that she was not going to work for a competitor and that she was going to work for a "small company."

75.    Trans Audit relied on Bishop's multiple assurances (which Trans Audit only later learned were false and were, in fact, lies) that she would not be working for a competitor and allowed Bishop to work during her two-week notice period and complete multiple transitional tasks including the transfer of existing clients and prospects to other Trans Audit employees.

76.    During the two-week period before she left Trans Audit, Bishop refused to cooperate and follow Trans Audit's instructions to call clients jointly with the

Trans Audit's employee (who was going to replace her), to let clients know of the transition. Instead, she called on the clients, alone, to tell them of her separation from Trans Audit, in direct disregard of Trans Audit's transition requirements and instructions and contrary to Bishop's obligation to protect—and not misappropriate—Trans Audit's legitimate business interests.

77.    During the two-week period before she left Trans Audit, Bishop also took it upon herself to complete a repository of Trans Audit's standard answers to clients' request for proposal ("RFP") questions, although this was a project she could or should have previously completed but had failed or neglected to complete for years and although she was not instructed to complete this project during the two-week period. The repository project would have involved a comprehensive review of Trans Audit's past, current and prospective clients and related communications and access to Trans Audit's confidential and proprietary information and other valuable business information, know-how and best practices which give Trans Audit a competitive advantage over its competition.

78.    Had it known that Bishop was leaving Trans Audit's employment to work for its direct and primary competitor, Trans Audit would have taken a very different approach upon Bishop's notice of resignation and would not have permitted Bishop's continued and unrestricted access to Trans Audit's confidential, proprietary and trade secret information, databases, systems, and clients.

<u>Days before Leaving Trans Audit, Bishop Accessed Trans Audit's Server,<br>Exfiltrated its Trade Secrets and Wiped Off Evidence<br>of her Nefarious and Unauthorized Activities</u>

79.     After Bishop's employment with Condata, Trans Audit retained an outside, professional computer forensics expert who confirmed that Bishop exfiltrated Trans Audit's confidential, proprietary and trade secrets information by copying, transferring, downloading or forwarding them to her personal devices, Dropbox account, personal email address and/or by taking them through other improper means.

80.     Bishop's unlawful, nefarious and unauthorized computer activities were not known to Trans Audit and were not discovered until upon the retention of the outside, professional computer forensics expert.

81.     According to the forensic analysis, in the days and weeks prior to leaving Trans Audit employment, Bishop using her company-provided laptop computer accessed from Trans Audit's servers a large volume of Trans Audit's confidential data, records and information including but not limited to Trans Audit's client and prospect reports, client and prospects lists, client and carrier references, RFP Proposal Repository, client contracts, client-specific activity reports, RFP responses and cost structure information to clients and prospective clients, client and carrier quotes, sales tracking reports, sales targets and expectations reports, commission reports, marketing presentations and information, compilation of

21

competitor information, and other data, records and information related to its business, systems, plans, strategies, clients and "know-how."

82.    Having already received an offer of employment from Condata, on or abound October 1, 2019, Bishop also accessed Trans Audit's Client Relationship Management (CRM) system, Highrise, which contains, among other things, over 6,000 contacts encompassing Trans Audit's clients, prospective clients, partners, carriers and other contacts critical to Trans Audit's business as well as comprehensive and carefully compiled data, records and information regarding Trans Audit's clients and prospective clients including pricing, sales strategy and communications. As she did not have file export capability from Highrise, Bishop generated multiple PDF reports from Highrise by downloading RViewer, an image viewer conversion program, to her company-provided laptop computer.

83.    Said data, records and information accessed by Bishop in the days and weeks prior to leaving her employment with Trans Audit include those pertaining to Trans Audit clients and prospective clients that were not assigned to Bishop. Many of the documents accessed by Bishop such as client contracts and clients-specific activity reports contain confidential financial and business information belonging to clients and/or are marked "confidential" or "proprietary & confidential."

84.    Said data, records and information accessed by Bishop in the days and weeks prior to leaving her employment with Trans Audit (collectively referred to as

the "Trade Secrets") are confidential and proprietary and constitute trade secrets under the Defend Trade Secrets Act and the Florida Uniform Trade Secrets Act.

85.    Moreover, and alternatively to the extent any of the above-described data, records and information Bishop accessed in the day and weeks prior to leaving her employment with Trans Audit do not constitute trade secrets, they constitute valuable business information and interests which give a competitor an unfair competitive advantage if disclosed.

86.    On or prior to October 18, 2019, the last day of her employment with Trans Audit, Bishop inserted multiple personal and nonwork USB/external storage devices to, and installed or updated a cloud-based file sharing software system Dropbox on, her company-provided laptop computer, for the purpose of exfiltrating Trans Audit's Trade Secrets.

87.    On October 14, 2019 and again on October 17, 2019, just day(s) prior to the last day of her employment, Bishop installed highly effective anti-forensics cleanup software to wipe and hide, permanently delete and prevent the recovery of her unlawful, nefarious and unauthorized computer activities. The use of these tools and in particular the manner in which they were utilized indicate a clear intent to cover up the nefarious computer activities by or through the assistance of a person with IT knowledge, sophistication or training. Upon information and belief,

Bishop's husband, Gary Bishop, is an IT professional with such knowledge, sophistication or training.

88.    Trans Audit has a PC, Data and Phone Protection and Security Policy ("Security Policy") which prohibits Bishop from engaging in an unauthorized use of its computer, allowing a third party access to Trans Audit's computer or phones and installing software or programs that are not authorized by Trans Audit.

89.    Attached hereto as Exhibit 5 is a true and correct copy of the Security Policy.

90.    Bishop was not authorized to install Dropbox, any anti-forensics cleanup software or any external USB devices on her company-provided laptop. Trans Audit has never used Dropbox and never asked Bishop to copy or backup Trans Audit files to Dropbox or any other file storage account, system or service.

91.    Access to confidential and proprietary trade secret information is restricted to those who "need to know." All networks or servers hosting Trans Audit's confidential and proprietary information require passwords and/or authentication for access. Company-issued computers and cellphones are password protected.

92.    Upon her separation from Trans Audit, Bishop returned her company-provided laptop, printer, and cell phone to Trans Audit's Apopka office. Prior to returning company equipment and information to Florida, Bishop deleted all work-

related text messages and voicemail from her company-provided cell phone. And she returned the company-provided laptop computer wiped cleaned of her unlawful, nefarious and unauthorized computer activities and without her password which required the company's IT to retrieve the password.

93.    Bishop's deception with regard to her future business engagement, multiple false assurances and lies that she was not going to work for a competitor and exfiltration, misappropriation and deletion of Trans Audit's Trade Secrets, individually and collectively, are evidence of her violation of the Contract and misappropriation and theft of Trans Audit's legitimate business interests.

94.    Bishop's conduct and acts including the taking of Trans Audit's Trade Secrets were done with Condata's knowledge and substantial assistance or encouragement.

**CONDATA AND BISHOP AS ITS EMPLOYEE AND AGENT MISAPPROPRIATED TRANS AUDIT'S TRADE SECETS AND OTHE BUSINESS INTERESTS**

Condata and Bishop Continued to Lie and Mislead
Trans Audit After Bishop's Employment Ended

95.    On October 25, 2019, and again on November 7, 2019, Trans Audit, through counsel, reminded Bishop of her contractual obligations and warned Bishop that Trans Audit would enforce the Contract including the non-compete, non-solicitation and non-disclosure provisions.

96.    Appended hereto as Composite Exhibit 6 is a true and correct copy of the letters dated October 25, 2019 and November 7, 2019, to Bishop.

97.    Subsequently, Trans Audit learned that Bishop was working for Condata as Condata's Vice President of Business Development & Strategy.

98.    Condata hired its own attorney to jointly represent Condata and Bishop and to deny the Contract's enforceability. Moreover, Condata and Bishop, through their joint attorney, provided multiple false assurances to Trans Audit that Bishop had not violated the Contract and that she did not possess "any Trans Audit Confidential information." For months thereafter, in reliance of Condata and Bishop's assurances that Bishop had not taken any of Trans Audit's confidential information, Trans Audit engaged in good faith efforts with Condata and Bishop to reach a resolution out of court.

99.    Appended hereto as Composite Exhibit 7 is a true and correct copy of the letters exchanged between attorneys for Trans Audit and Bishop/Condata dated November 22, 2019, December 19, 2019, December 27, 2019, January 14, 2020, March 13, 2020 and March 16, 2020.

<u>Condata and Bishop Misappropriated Trans Audit's Trade Secrets</u>

100.   As Condata's Vice President of Business Development & Strategy, Bishop possesses and has used and misappropriated the Trade Secrets she took from

26

Trans Audit, during the course of her employment with Condata and for Condata's benefit.

101.  Moreover, Condata has received Trans Audit's Trade Secrets from Bishop and therefore possesses and has used and misappropriated Trans Audit's Trade Secrets.

102.  Shortly after becoming employed with Condata, Bishop admittedly gave Trans Audit's client list which she took from Trans Audit without Trans Audit's knowledge or consent, to Condata by emailing or otherwise disclosing it to Condata's then CEO Dave Newberry, Executive Vice President of Sales & Marketing John Vincent and Director of New Business Development Tina Clark. Said client list was and is stored on Bishop's laptop computer provided by Condata.

<u>Condata and Bishop Solicited Trans Audit Clients and Prospects</u>

103.  After she went to work for Condata and during the course of her employment with Condata, Bishop has solicited, called upon and/or serviced Trans Audit's clients and prospective clients for the benefit of Condata.

104.  Condata, through or in concert with Bishop, diverted Trans Audit's clients Canon and Xylem, Inc. both of which were significant existing clients of Trans Audit during Bishop's employment with Trans Audit and became Condata's clients after Bishop joined Condata.

105.   Condata, through or in concert with Bishop, diverted a specific prospective customer, Ross Dress for Less, Inc. ("Ross Stores"), which Trans Audit was actively pursuing while Bishop was employed by Trans Audit and thereafter.

106.   In fact, Bishop communicated and setup a meeting with Ross Stores for Trans Audit for October 17, 2019—just one day before leaving her employment; on October 17, 2019, she was copied on an email from Ross Stores to Van Vliet containing a signed confidential nondisclosure agreement between Trans Audit and Ross Stores entitled Trans-Audit-Ross MUTUAL 10719.PDF; and the same day, Bishop forwarded the PDF document to her personal email address with the intent to disclose it to Condata or use it for Condata's benefit.

107.   Bishop was not authorized to take this confidential document belonging to Trans Audit and transfer it to herself using her personal email account. After she went to work for Condata, Bishop used Trans Audit's Trade Secrets, the nondisclosure agreement she took from Trans Audit and the contacts she established while working for Trans Audit to solicit Ross Stores' business for Condata.

108.   Condata, through or in concert with Bishop, also diverted a specific prospective customer, VF Corporation (a/k/a "Vanity Fair"), which Trans Audit had been actively pursuing while Bishop was employed by Trans Audit and thereafter.

109.   Bishop knew of Trans Audit's plans and strategies to solicit Vanity Fair, and on multiple occasions participated in the marketing of Trans Audit's services to Vanity Fair and establishing meetings with Vanity Fair.

110.   Not long after Bishop's departure from Trans Audit, Vanity Fair confirmed to Trans Audit that it was working with Condata and Bishop on behalf of Condata, confirming that Bishop was directly involved in the solicitation and diversion of Vanity Fair away from Trans Audit.

111.   Other prospective clients diverted by Condata, through or in concert with Bishop, include WestRock which was a prospective client Bishop solicited for Trans Audit while she was employed with Trans Audit.

112.   As a result, Condata and Bishop have diverted at least three significant and specific businesses away from Trans Audit, for the benefit of Condata, based on Bishop's prior contact and relationship with these specific prospective clients as an employee of Trans Audit.

113.   Bishop has specific knowledge of Trans Audit's confidential, proprietary and trade secret information including but not limited to pricing strategies and limitations, which knowledge and information would permit a competitor to outbid Trans Audit for the business of prospective clients such as Ross Stores, Vanity Fair and WestRock.

114.   Moreover, Condata, through Bishop, also interfered with Trans Audit's business relationships with General Motors and Home Depot which were existing clients of Condata that would have in all likelihood used Trans Audit's services but for the interference.

115.   While she employed with Trans Audit, Bishop solicited Home Depot which was seriously considering utilizing Trans Audit as a replacement for or in conjunction with Condata. Likewise, while she was employed with Trans Audit, Bishop solicited General Motors which was seriously considering utilizing Trans Audit. Bishop knew of Trans Audit's marketing activities, pricing and proposed contractual conditions for these clients and after joining Condata, improperly used Trans Audit's information on behalf of Condata, to keep these prospective clients from utilizing Trans Audit's services.

116.   Trans Audit is concerned Condata, through or in concert with, Bishop will continue to misappropriate and use Trans Audit's confidential, proprietary or trade secret information and has diverted other businesses away from Trans Audit.

<u>ATTORNEY FEES</u>

117.   Trans Audit has retained counsel and is obligated to pay attorney fees and costs in bringing this action. Trans Audit is also entitled to attorney fees under 18 U.S.C. § 1836(b) and Fla. Stat. § 688.005.

## COUNT I: MISAPPROPRIATION OF TRADE SECRETS (DTSA)

118. Trans Audit adopts and incorporates by reference herein paragraphs 1 through 117, above.

119. Trans Audit seeks injunctive relief and damages for misappropriation of its Trade Secrets by Condata under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq*.

120. Trans Audit owns and possesses the Trade Secrets described in paragraphs 79 through 82 which are related to its products or services used in or intended for use in interstate or foreign commerce.

121. Trans Audit has taken reasonable measures to keep said Trade Secrets secret and confidential.

122. Trans Audit's Trade Secrets are not public knowledge and are not available for others including its competitors to use through any legitimate means.

123. Trans Audit's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, another person who could obtain economic value from their disclosure or use.

124. Bishop had a duty to maintain the secrecy of Trans Audit's Trade Secrets, both during and after Bishop's employment with Trans Audit.

125. In breach of her duty and in violation of Trans Audit's rights, prior to leaving employment with Trans Audit, Bishop by improper means took Trans

31

Audit's Trade Secrets; disclosed Trans Audit's Trade Secrets to Condata; and used Trans Audit's Trade Secrets on behalf of Condata, for the benefit of herself and Condata and to Trans Audit's detriment.

126.    Condata, through Bishop, has received or possesses Trans Audit's Trade Secrets and has used or otherwise misappropriated Trans Audit's Trade Secrets.

127.    Condata knew or had reason to know that Trans Audit's Trade Secrets were acquired by Bishop by improper means.

128.    Condata's use or misappropriation of Trans Audit's Trade Secrets was knowing, willful and malicious.

129.    Condata's conduct constitutes a violation of the DTSA.

130.    Condata's conduct has injured and will injure Trans Audit and has unjustly enriched and will unjustly enrich Condata.

131.    If Condata is not enjoined, it will continue to misappropriate and use Trans Audit's Trade Secrets for its own benefit and to Trans Audit's detriment.

132.    As the direct and proximate result of Condata's conduct, Trans Audit has suffered and, if Condata's conduct is not stopped, will continue to suffer severe harm, irreparable injury, and damages. Because Trans Audit's remedy at law is inadequate, Trans Audit seeks preliminary and permanent injunctive relief to recover and protect its Trade Secrets. Trans Audit is also entitled to exemplary damages for

Condata's willful and malicious misappropriation and use of Trans Audit's Trade Secrets, in addition to actual damages and damages for Condata's unjust enrichment.

COUNT II: MISAPPROPRIATION OF TRADE SECRETS (FUTSA)

133.    Trans Audit adopts and incorporates by reference herein paragraphs 1 through 117, above.

134.    Trans Audit seeks injunctive relief and damages for misappropriation of its Trade Secrets by Condata under the Florida Uniform Trade Secrets Act (FUTSA), Fla. Stat. § 688.001 *et seq*.

135.    Trans Audit owns and possesses the Trade Secrets described in paragraph 79 through 82.

136.    Trans Audit has taken reasonable measures to keep said Trade Secrets secret and confidential.

137.    Trans Audit's Trade Secrets are not public knowledge and are not available for others including its competitors to use through any legitimate means.

138.    Trans Audit's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, another person who could obtain economic value from their disclosure or use.

139.    Bishop had a duty to maintain the secrecy of Trans Audit's Trade Secrets, both during and after Bishop's employment with Trans Audit.

140.    In violation of Trans Audit's rights, prior to leaving employment with Trans Audit, Bishop by improper means took Trans Audit's Trade Secrets; disclosed Trans Audit's Trade Secrets to Condata; and used Trans Audit's Trade Secrets on behalf of Condata, for the benefit of herself and Condata.

141.    Condata, through Bishop, has received or possesses Trans Audit's Trade Secrets and has used or otherwise misappropriated Trans Audit's Trade Secrets.

142.    Condata knew or had reason to know that Trans Audit's Trade Secrets were acquired by Bishop by improper means.

143.    Condata's misappropriation of Trans Audit's Trade Secrets was knowing, willful and malicious.

144.    Condata's conduct constitutes a violation of the FUTSA.

145.    Condata's conduct has injured and will injure Trans Audit and has unjustly enriched and will unjustly enrich Condata.

146.    If Condata is not enjoined, it will continue to misappropriate and use Trans Audit's Trade Secrets for its own benefit and to Trans Audit's detriment.

147.    As the direct and proximate result of Condata's conduct, Trans Audit has suffered and, if Condata's conduct is not stopped, will continue to suffer severe harm, irreparable injury, and damages. Because Trans Audit's remedy at law is inadequate, Trans Audit seeks preliminary and permanent injunctive relief to recover

and protect its Trade Secrets. Trans Audit is also entitled to exemplary damages for Condata's willful and malicious misappropriation and use of Trans Audit's Trade Secrets, in addition to actual damages and damages for Condata's unjust enrichment.

COUNT III: TORTIOUS INTERFERENCE
WITH CONTRACTUAL RELATIONSHIP

148.    Trans Audit adopts and incorporates by reference herein paragraphs 1 through 116, above.

149.    The Contract between Bishop and Trans Audit is a valid and enforceable contract.

150.    The Contract's restrictive covenants are reasonably limited in duration and geographic scope given the global nature of Trans Audit's business and are reasonably necessary and designed to protect Trans Audit's legitimate business or economic interests justifying the restrictions.

151.    Moreover, the Contract's confidentiality provision prohibiting Bishop from, at any time, directly or indirectly using, divulging, communicating or disclosing to a third party any of Trans Audit's confidential information for any purpose, is valid and enforceable.

152.    Condata knew of the Contract and Bishop's post-employment obligations set forth therein prior to offering Bishop employment, and thereafter.

153.    Despite having knowledge of the Contract and receiving multiple communications and notices from Trans Audit regarding Bishop's contractual

obligations, Condata procured and continued to procure Bishop's breach of the Contract by hiring her and continuing to employ her, in direct and unfair competition with Trans Audit.

154.   Condata hired and strategically and intentionally placed Bishop in a position that would require and/or result in her disclosing, using and misappropriating Trans Audit's legitimate business interests, for the benefit of Condata.

155.   Through Condata's continued employment of Bishop, Condata and Bishop have solicited Trans Audit's customers and prospective customers for the benefit of Condata.

156.   Through Condata's continued employment of Bishop, Condata and Bishop have used, divulged, communicated or disclosed Trans Audit's confidential, proprietary and trade secret information for the benefit of Condata.

157.   Condata's interference with Trans Audit's Contract with Bishop was intentional and unjustified, was not privileged and was accomplished through improper means.

158.   As a result, Trans Audit has suffered damages.

159.   The damages caused by Condata's tortious interference has caused and will continue to cause irreparable injury to Trans Audit's legitimate business interests.

160.    It is difficult for Trans Audit to estimate the amounts of business that it has lost and will lose as a result of Condata's intentional interference. Trans Audit does not know with any degree of certainty, at this time, the nature and extent of its actual and potential damages incurred and to be incurred as a direct and consequential result of Condata's intentional interference.

161.    The injuries sustained by Trans Audit, as well as those threatened by Condata's intentional, ongoing actions are irreparable, and Trans Audit has no adequate remedy at law to fully protect itself from the interference and damaging actions of Condata.

162.    An injunction will serve the public interest by protecting Trans Audit's legitimate business interests.

## COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

163.    Trans Audit adopts and incorporates by reference herein paragraphs 1 through 116, above.

164.    Trans Audit has protectable, contractual or advantageous business relationship with its clients and prospective clients including those identified in paragraphs 104 to 115.

165.    Condata knows and knew of Trans Audit's business relationship with its clients and prospective clients.

166.    Condata, directly or indirectly through Bishop, used Trans Audit's confidential, proprietary and trade secret information to unfairly compete with Trans Audit, solicit Trans Audit's clients and prospective clients and tortiously interfere with said relationships.

167.    Condata's interference with Trans Audit's business relationship with its clients and prospective clients was intentional and unjustified, was not privileged and was accomplished through improper means.

168.    As a result, Trans Audit has suffered damages.

169.    The damages caused by Condata's tortious interference has caused and will continue to cause irreparable injury to Trans Audit's legitimate business interests.

170.    It is difficult for Trans Audit to estimate the amounts of business that it has lost and will lose as a result of Condata's intentional interference. Trans Audit does not know with any degree of certainty, at this time, the nature and extent of its actual and potential damages incurred and to be incurred as a direct and consequential result of Condata's intentional interference.

171.    The injuries sustained by Trans Audit, as well as those threatened by Condata's intentional, ongoing actions are irreparable, and Trans Audit has no adequate remedy at law to fully protect itself from the interference and damaging actions of Condata.

172. An injunction will serve the public interest by protecting Trans Audit's legitimate business interests.

## COUNT V: AIDING AND ABETTING
## BREACH OF DUTY OF LOYALTY

173. Trans Audit adopts and incorporates by reference herein paragraphs 1 through 116, above.

174. As Trans Audit's employee, Bishop owed Trans Audit a duty of loyalty during her employment with Trans Audit.

175. By engaging in the aforementioned actions, and in particular the actions described in paragraphs 70 through 93, in anticipation of her future competition, Bishop breached her duty of loyalty to Trans Audit.

176. Condata had knowledge of the breach of duty of loyalty by Bishop.

177. Condata substantially assisted and/or encouraged Bishop's breach of duty of loyalty for purposes of achieving financial gain.

178. As a result of Condata's conduct, Trans Audit has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Trans Audit respectfully requests that this Honorable Court enter judgment against Condata and

a. Enter an injunction enjoining Condata from employing Bishop in a business competitive to Trans Audit in violation of the Contract, for a period of two years from the date any such injunction is granted;

b.    Enter an injunction enjoining Condata from misappropriating, divulging or disclosing to anyone, any of Trans Audit's Trade Secrets;

c.    Order Condata to return to Trans Audit all of its data, records and information Bishop has provided to Condata;

d.    Award money damages including liquidated damages and compensation for lost revenues incurred between the date Condata hired Bishop and the date of the granting of an injunction in this matter, in addition to any actual and consequential money damages that may be incurred by Trans Audit thereafter for Condata' tortious interference and diversion of business;

e.    Award exemplary damages caused by misappropriation of Trade Secrets;

f.    Award other damages caused by Condata's wrongful conduct;

g.    Grant an accounting of revenues lost and business diverted to Condata;

h.    Declare that the term and duration of the prohibitions and restrictive covenants in the Contract shall not be determined to have commenced until such time as all violations thereunder cease;

i.    Award Trans Audit recovery of its attorney fees and costs (as to Counts I and II); and

j.    Grant such other and further relief as this Court deems just and proper.

<u>REQUEST FOR JURY TRIAL</u>

Trans Audit requests a trial by jury on all issues so triable.

Dated this 17th day of November, 2022.

Respectfully submitted,

DONNELLY + GROSS

<u>s/ Paul A. Donnelly</u>
PAUL A. DONNELLY, Trial Counsel
Florida Bar No. 813613
paul@donnellygross.com
<u>s/ Jung Yoon</u>
JUNG YOON
Florida Bar No. 0599611
jung@donnellygross.com
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
(352) 374-4046 (facsimile)

Counsel for Plaintiff

## VERIFICATION

Under penalties of perjury, under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, I, CHAD W. KENNEDY, IV, declare that I have read the foregoing Verified Complaint for Injunctive Relief and Damages and state that the facts stated in it are true and correct to the best of my knowledge and belief.

Executed in Alachua County, Florida this 17th day of November 2022.

CHAD W. KENNEDY, IV

42

# EXHIBITS

1

## Employment Agreement

This Agreement dated December 9, 2015 is made by and between Trans Audit, Inc., ("Trans Audit"), an at will employer located at 11 Marshall Road, Suite 2D, Wappingers Falls, NY 12590, and Kristy Bishop ("Employee") located at 118 Creekview Lane Dallas, GA 30157 with Federal Tax Identification Number _____

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Trans Audit and Employee agree as follows:

1. **Title**: Employee's title shall be Client & Market Development Manager.

2. **Commencement Date**: Employment as Client & Market Development Manager shall commence on December 28, 2015.

3. **Primary Job Responsibilities**: Employee's primary responsibilities shall include 1) inside sales (attainment of conference calls and meetings for other sales personnel, 2) direct sales of Trans Audit's cost recovery and reduction services to prospects, 3) sales and marketing support, 4) cross selling of Trans Audit services to Clients brought to Trans Audit by Employee and Clients assigned to Employee by Trans Audit, 5) Client support, 6) support of the carrier claim resolution and payment process for assigned Clients, 7) collection support for outstanding receivables from carriers and Clients, and 8) other work or special projects as assigned by Trans Audit's Executive staff.

4. **Base Salary** Commencing December 28, 2015, Employee's annual base salary shall be $35,000 based on a minimum of 40 hours worked per week.

5. **Contingent Compensation**: Unless Employee breaches this Agreement, Employee shall be entitled to receive additional compensation or commission equal to; a) 10% of Net Collected Fees for services for which Employee directly delivered a contract for such services to Trans Audit, b) 5% of Net Collected Fees derived from jointly developed accounts, whereby the account was closed by Employee in conjunction with another salesperson, c) $100.00 one time for each meeting or conference call set up with a potential Client by Employee and thereafter conducted by other Trans Audit personnel, d) $250.00 one time for each contract closed with an account which Employee established the initial conference call or meeting with the potential Client, and or e) 1.0% of Net Collected Fees for each post audit contract closed by Trans Audit with an account for which Employee established the initial conference call or meeting with the potential Client. One time per call, per meeting and per contract compensation shall be paid to Employee biweekly in conjunction with Trans Audit's payroll processing policies. "Net Collected Fees" are defined as Trans Audit's revenue (typically, refund received times Trans Audit's contingency rate with the Client, less third party fees, if any) for which Trans Audit has received payment from the Client. Commissions due to Employee will be paid in the second calendar month after the Client is invoiced and in the payroll run closest to the fifteenth of the month. Monthly commission reports will be provided to Employee by Trans Audit. Trans Audit may withhold a commission payment until such time a Client pays an invoice, if Trans Audit has reason to doubt that the Client will not pay said invoice. No commission shall be owed by Trans Audit with respect to fees collected by Trans Audit greater than six (6) months after the termination date of this Agreement, or fees payable by Clients but not actually received by Trans Audit. Employee shall promptly reimburse Trans Audit for any commissions for invoices which Client does not pay Trans Audit or for commissions paid for fees received by Trans Audit, but subsequently refunded to the Client for any reason. Reimbursable fees or commissions may be netted from future commission payments.

6. **Benefits**: Medical and Dental Insurance as per Trans Audit's existing plans. Employee shall be entitled to three (3) weeks paid vacation. The first vacation week may be taken after six (6) months of employment and the subsequent weeks after nine (9) months of employment.

7. **Company Equipment & Software**. Trans Audit shall provide Employee with a laptop, docking station, monitors, multifunction machine, cell phone, and high speed internet access. Any and all equipment and software provided to Employee by Trans Audit shall remain the property of Trans Audit and Employee shall have the right to use such equipment and software solely during the term of this Agreement. Employee shall use reasonable care and ensure that all equipment and software remains in good condition and repair. In the event of termination of this Agreement for any reason, Employee shall immediately return to Trans Audit all equipment and software in Employee's possession. All equipment and software shall be returned to Trans Audit in good working order with all peripherals and all electronic and program files intact.

8. **Expenses**: Trans Audit shall reimburse Employee for all reasonable business and travel expenses provided such expenses are necessary to support Employee's responsibilities and in accordance with Trans Audit's policies.



9.  **Confidentiality:** For purposes of this Agreement, "Confidential Information" shall mean this Agreement and Trans Audit's or its Client's information in any and all forms (including without limitation Trans Audit's Clients, Client names, ideas, concepts, techniques, trade secrets, know-how, computer programs and records, marketing strategies and development, pricing, product development, strategic plans, software design and/or development documents, source and object code, files, tapes, diskettes, data, reports, research, business plans, financial information, Client names, notes, work papers, lists, contracts, sales information, [marketing information or materials,] documents, implementation plans, market research, technical research, inventions, patent applications, evaluations, benchmarks, test results, identities of employees, partners, suppliers and/or competitors, or other information of a competitive nature) relating to the business of Trans Audit or their products or services, if received or acquired by Employee in connection with this Agreement, or regarded by Trans Audit as proprietary and confidential. Notwithstanding the foregoing, Employee agrees that it shall not, directly or indirectly, use, divulge, communicate, or disclose to a third party any of Trans Audit's Confidential Information for any purpose. Promptly, but in no event more than ten (10) days after the termination of this Agreement or after any request of Trans Audit, Employee shall return to Trans Audit via traceable means, such as Federal Express, all Confidential Information in whatever form in Employee's possession or control, including without limitation, all electronic files, copies and reproductions, and all compilations, summaries or other work papers. The terms and conditions of this section shall survive termination of the Agreement.

10. **Intellectual Property.** For purposes of this Agreement, "Intellectual Property" shall mean any (i) inventions, discoveries, improvements, ideas, designs, developments, concepts, techniques, marketing techniques, processes, technology or know-how (whether patentable or not); (ii) works of authorship, claims, cost reduction strategies, copyrightable or trademark material; (iii) trade secrets; and (iv) information and data related to, forming the basis for, or arising from items (i) through (iii) above. Each party acknowledges and agrees that the Intellectual Property arising out of or relating to the services provided by Employee shall be owned solely and exclusively by Trans Audit. Nothing in this Agreement shall convey to Employee any right, title, license or interest in Trans Audit's Intellectual Property whether preexisting or developed during or under this Agreement. All programs or auditing tools provided to Employee shall remain the property of Trans Audit and Employee agrees to solely utilize such programs or tools to solely perform services for Trans Audit and Trans Audit's Clients. Employee shall immediately cease use of and return all programs and tools to Trans Audit at Trans Audit's request or upon termination of this Agreement. The terms and conditions of this section shall survive termination of the Agreement.

11. **Non-Compete & Non-Solicitation.** Employee agrees that during the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, Employee shall not, directly or indirectly, by itself or on behalf of any other individual, partnership, firm, corporation or other business entity, engage in a business that is similar to Trans Audit's cost management business. This preceding restriction shall not apply to the preexisting freight audit and payment (pre-audit) expertise of Employee. In the event that Employee does not adhere to the provisions of this paragraph 11 and Employee performs services for Trans Audit's Clients, their divisions or affiliates or for prospects of Trans Audit, Employee shall pay to Tran Audit as liquidated damages, all revenues received from such entities for which services were performed. Employee shall not during the term of this agreement and for a period of two (2) years after termination of this Agreement for any reason, solicit Trans Audit's Clients, prospects or staff, or hire employees or Employees of Trans Audit. Trans Audit will be entitled to obtain injunctive relief to protect and enforce its rights herein and shall be further entitled to an accounting of all earning, profits or other benefits acquired by Employee as a result of such breach in addition to any and all remedies available at law without the need to post a bond or other undertaking. Trans Audit in any dispute hereunder shall be entitled to recover reasonable attorney fees and costs.

12. **Remedies.** Employee agrees that a breach of the Intellectual Property, Confidentiality and Non-Compete & Non-Solicitation provisions of this Agreement will cause Trans Audit irreparable damage for which recovery of money damages alone would be inadequate. Therefore, Trans Audit will be entitled to obtain injunctive relief to protect and enforce its rights hereunder in addition to any and all remedies available at law without the need to post a bond or other undertaking. Trans Audit in any dispute hereunder shall be entitled to recover reasonable attorney fees and costs.

13. **Modifications.** Trans Audit reserves the right to modify this Agreement as necessary to support its business objectives or special circumstances.

14. **Performance Restrictions.** Employee represents and warrants to Trans Audit that Employee is not obligated or restricted under any agreement (including any non-competition or confidentiality agreement), judgment, decree, order or other restraint of any kind, which could impair Employee' ability to perform the duties and

obligations required of Employee hereunder, or create a material liability for Trans Audit. Employee will hold Trans Audit harmless for all actions resulting from prior infringements on Employee's ability to perform work under this Agreement.

For Trans Audit

Chad W. Kennedy, IV

Date: 12/11/15

Kristy Bishop - Employee

Date: 12-11-15

## Addendum 1 – Sales Qualifications & Criteria

Sales compensation as set forth in Section 5 of the Employment Agreement will be based upon the fulfillment of each the following criteria:

1.1.   To qualify for sales compensation, all accounts must be pre approved by Trans Audit to prevent conflict with Trans Audit's sales personnel and agents. Before initiating contact with any referral account, Employee shall obtain written approval from Trans Audit. Once a referred account has been approved by Trans Audit it shall be deemed an "Approved Account". Additionally, Trans Audit shall indicate in writing its services approved for marketing (the "Approved Services") to the Approved Account(s). Only Approved Services for Approved Accounts shall be subject to compensation.

1.2.   A "Jointly Developed Account" shall mean the following:

1.2.1.   Employee has developed the initial relationship with the Approved Account;

1.2.2.   The initial relationship is with an individual capable of making the "buy decision" for the Approved Services as applicable;

1.2.3.   Employee has discussed, and determined initial interest in, the other party's services with the Approved Account;

1.2.4.   Employee facilitates, participates in and assists with conference calls or meetings by and between the Approved Account and Trans Audit to discuss Trans Audit's services; and

1.2.5.   Employee assists where requested throughout the sales process, including but not limited to additional sales discussions, meetings and/or phone calls, contract negotiations and other general sales follow-up activities.

1.2.6.   Employee or Trans Audit ascertains an executed contract from the Jointly Developed Account.

1.3.   A "Referral Lead" shall mean the following:

1.3.1.   Employee has developed some type of initial relationship with the Approved Account;

1.3.2.   The initial relationship is with an individual capable of making the "buy decision" for the Approved Services as applicable; and

1.3.3.   Employee facilitates an introduction to the Approved Account, at least byway of conference call, of Trans Audit that leads to a contract between the Approved Account and Trans Audit.

2

Condata Global is the leading provider of freight bill post audit services in the world.     **Start Here ›**

## Freight Post Audit Services



**Type of Freight Audits We Perform**

Condata is the world leader in freight post audit services, auditing over $20B annually for our clients. Our world class freight audits are performed for all transportation modes globally and intensively review all of your payments against your rates and contracts.

View Our Services

## Freight Post Audit Technology



**Technologies We Utilize**

Our advanced technology is formulated for our freight audit and is continually updated to account for current trends in the industry. Our auditors are our greatest resource and our technology stands alone in the industry and is designed to meet the needs of our clients.

Learn More

## Contact Us



**Contact Us for a Free Consultation**

Interested in working with us on your next audit? We'll be happy to answer any questions you may have or give you a demonstration of our process and technology.

Contact us today.

Get in Touch

## Why Partner with Condata Global?

- History
- Mission
- Carrier Relationships



Since 1956, Condata Global has been performing comprehensive freight audits for our clients. We continue to be dedicated to the following core values:

- Quality and Integrity
- Technology
- Continuous Improvement
- Customer Service
- Network and Cyber Security

Overall, we employ a balanced audit process leveraging the expertise of our experienced audit staff and our state-of-the-art technology to ensure the most efficient, effective and profitable freight audit in the industry.

Our mission is to provide the highest quality freight audit and recovery service in the industry for all of our customers. In fulfilling our mission, Condata Global always seeks to establish strategic relationships with our clients in order to assist them in better managing their transportation expenditures.

It is our commitment to accomplish this through state-of-the-art technology, our highly experienced audit staff and by employing effective monitoring and reporting systems.

## Industry Updates and Resources



### Industry, Government and Transport News:

Journal of Commerce  -  U.S. DOT  -  Transport Topics

### Currency Exchange Rates:

Oanda  -  Wall Street Journal  -  Reuters

### Market & Financial Research:

Market Sector Performance



Home    About    Audit Solutions    Technology    FAQs    Contact    Log In

## About Us

Home › About



## About Condata Global

Condata Global is the largest and most respected provider of freight post audit and recovery services in the world. Established in 1956, Condata Global began doing business as Continental Freight Traffic Services. In 1973, Condata Global's leadership renamed the company Continental Freight Data Systems as technology began to drive the vision of the company. This name was later shortened to Condata Global which is the name our clients know us by today.

The majority of Condata's clients are Fortune 500 companies and the scope of our freight audit service includes all domestic and international shipments. We perform US domestic freight audits as well as intra-European, intra-Asian, and intra-Latin American audits for our clients. Condata Global provides unparalleled expertise in all transportation modes where our industry leading audit staff utilize our state-of-the-art technology to perform our audits.

## The Condata Difference

 ### Global Leader

Condata Global has been in the freight post audit business since 1956 and is the recognized global leader in freight audit solutions.

 ### Multi Format

We perform comprehensive audits on EDI, electronic payment files and paper freight bills and their images for all freight bill overpayments.

 ### All Modes

Condata performs freight audits for all modes of transportation including both domestic and international shipments.

 ### Top Tier Clients

Condata audits more Fortune 10, Fortune 50, and Fortune 100 companies than any other provider in the world.

 ### Balanced Process

Condata employs a balanced audit process with our experienced audit staff and state-of-the-art electronic audit capabilities.

 ### IT Infrastructure

Condata employs proprietary software that is updated continually to reflect the current trends in the freight audit industry.

 ### Partnership

We pride ourselves in the strong relationships we have with our customers and our customers' freight payment companies and carriers.

 ### Singular Focus

Freight post audit is, and always has been, our only service offering. All of our staff, technology, and focus is dedicated to your freight audit.



Home     About     **Audit Solutions**     Technology     FAQs     Contact     Log In

## Freight Post Audit

Home > Audit Solutions

**Audits We Perform**

> Freight Post Audit

> Second Post Audit

> International Audit



> Condata Global is the leader in freight post audit services, the standard by which all other post audit companies are judged.

### Freight Post Audit Solutions

Our freight auditors excel in domestic and international post audit solutions for numerous shippers, all on a contingency fee basis. Our best-in-class freight audit covers all transportation modes including truck, rail, air, ocean and parcel and encompasses intermodal and international shipments (import/export) using our industry leading proprietary freight audit technology. Condata Global supports your financial compliance requirements and helps you control your transportation costs within contractual time limits to capture maximum results.



### Freight Post Audit

Literally hundreds of different types of payment, rating and contractual errors occur in the normal course of paying freight bills for larger shippers. A freight audit after payment can identify and recover up to 2-3% of your shipping costs.

Improve your financial performance and turn your routine practices into best practices with Condata Global. We will work with your established freight payment provider (or in-house staff) in order to initiate the audit. Our expert freight auditors and our industry leading technology will thoroughly review your rates, contracts, and payments and perform an audit of all of your EDI, paper freight bills, images and other backup documents that are available. We will then report the freight audit results to you via our web portal along with our best-in-class monthly reporting.

### Condata Global by the Numbers

- Over $20B
- Over 60M
- 76
- 60+
- 18
- 3
- 2
- 1

The total amount of freight spend Condata Global audits annually

The number of freight bills Condata Global audits annually

The average number of days it takes for a claim to be paid

The number of years Condata has been in the freight audit industry

The average years of experience of our freight post audit staff

The number of customers Condata Global serves in the Fortune 10

3

| | |
|---|---|
| **From:** | Dave Newberry |
| **To:** | Chad W. Kennedy, IV |
| **Subject:** | RE: Visiting Florida |
| **Date:** | Friday, September 13, 2019 9:19:31 AM |
| **Attachments:** | image011.jpg |
| | image002.png |
| | image004.png |
| | image006.png |
| | image008.png |
| | image010.png |
| | image012.jpg |

Thanks for the note back, Chad. When I have a sense for my schedule, I'll let you know the next time I'll be in Florida.

Just to call it out – I'm sure that it seems inauthentic (or just plain annoying) for a direct competitor to reach out to you directly the way that I have. Knowing that, I truly appreciate the openness that you've afforded me in even entertaining a future conversation.

Warm regards,

Dave

**From:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Sent:** Friday, September 13, 2019 8:08 AM
**To:** Dave Newberry <dnewberry@condata.com>
**Subject:** RE: Visiting Florida

Dave,
I will not be in southern Florida next week.  No need for any note or further follow up other than to see if we can meet face to face at some time if our paths cross.

Thanks,
Chad
+1 973.229.5123
www.transaudit.com
Email Signature 100



**From:** Dave Newberry <dnewberry@condata.com>
**Sent:** Friday, September 13, 2019 9:04 AM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** RE: Visiting Florida

Hi Chad,

Just touching base on next week. No problem if our calendars don't align, just let me know. While I had hoped to connect in person, perhaps it's easier if I just send a note over email next week. Then you can decide if it makes sense to continue a conversation either over the phone or in person. Of course, I'm happy to meet in Chicago too if you ever come our way.

Warm regards,

Dave

PS - As I mentioned before, the folks here have expressed so much respect for the Trans Audit team to me. I'd love to stay connected – as the leading providers in a great industry with a ton of opportunity ahead of us, my hope is that we can think through how we can support, strengthen, and grow both of our businesses over the long term.

---

**From:** Dave Newberry
**Sent:** Tuesday, August 27, 2019 7:58 PM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** Re: Visiting Florida

Sounds great. Thank you.

---

**From:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Sent:** Tuesday, August 27, 2019 6:31:02 PM
**To:** Dave Newberry <dnewberry@condata.com>
**Subject:** RE: Visiting Florida

Dave,
That week may work, but I will not know my final schedule until the week before.  I will let you know as soon as I know.

Thanks,
Chad
+1 973.229.5123
www.transaudit.com

Email Signature 100



---

**From:** Dave Newberry <dnewberry@condata.com>
**Sent:** Tuesday, August 27, 2019 1:38 PM

**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** RE: Visiting Florida

Hi Chad,

Hope that you're well. I'm working on booking my flights out to Florida. Wanted to check in once more to see if there was a good day that week when we could connect in person (week of September 16th).

Feel free to say "no" if you can't do this, but do you think we can find a time to connect that week?

Thanks,

Dave

---

**From:** Dave Newberry
**Sent:** Monday, August 19, 2019 6:15 AM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** RE: Visiting Florida

Chad,

I'll be in Fort Myers (looking at Tuesday / Wednesday that week but flexible) but would be happy to stop by somewhere convenient for you on the way there (Monday) or on the way back (later in the week).

Thanks,

Dave

---

**From:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Sent:** Monday, August 19, 2019 6:11 AM
**To:** Dave Newberry <dnewberry@condata.com>
**Subject:** RE: Visiting Florida

Dave,
Please let me know where you will be in FL.

Thanks,
Chad
+1 973.229.5123
www.transaudit.com

Email Signature 100

---

**From:** Dave Newberry <dnewberry@condata.com>
**Sent:** Sunday, August 18, 2019 4:22 PM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** Pleae let me know where you will be in FoRE: Visiting Florida

Hi Chad,

Hope you're well. I wanted to let you know that it looks like I'll be down in Florida the week of September 16th – any chance there's a day that week that would work for you?

Please feel free to say if that doesn't work. We will get something on the books for one of these days!

Thank you,

Dave

---

**From:** Dave Newberry
**Sent:** Sunday, August 4, 2019 2:49 PM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** Re: Visiting Florida

Perfect. Thanks.

---

**From:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Sent:** Sunday, August 4, 2019 2:39:05 PM
**To:** Dave Newberry <dnewberry@condata.com>
**Subject:** RE: Visiting Florida

Dave,
I am fully book for August, and my  September schedule is being worked on at this time.  Once my schedule is further solidified for September, I will let you know if Florida or Chicago are options.

Thanks,
Chad
+1 973.229.5123
www.transaudit.com

Email Signature 100

---

**From:** Dave Newberry <dnewberry@condata.com>
**Sent:** Friday, August 2, 2019 2:58 PM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** RE: Visiting Florida

Hi Chad,

Any weeks that would work for you in late August – September? Planning another trip and would love to connect.

Thanks,

Dave

---

**From:** Dave Newberry
**Sent:** Monday, July 8, 2019 8:30 AM
**To:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Subject:** RE: Visiting Florida

Thanks for the heads up and I hope you had a great Fourth of July holiday last week.

We will be down again soon, so I'll let you know what we're looking at next time. For future reference, are you usually in the Gainesville area or elsewhere?

Thanks!

Dave

---

**From:** Chad W. Kennedy, IV <ckennedy@transaudit.com>
**Sent:** Monday, July 8, 2019 8:26 AM
**To:** Dave Newberry <dnewberry@condata.com>
**Subject:** RE: Visiting Florida

Dave,
Unfortunately, due to a schedule change, I will not be able to meet this week. Hopefully, on your next Florida foray or my next Chicago foray, we can meet.

Safe travels!

Thanks,
Chad
+1 973.229.5123
www.transaudit.com

Email Signature 100

-----Original Appointment-----
**From:** Chad W. Kennedy, IV
**Sent:** Wednesday, June 12, 2019 9:23 AM
**To:** Dave Newberry
**Subject:** Accepted: Visiting Florida
**When:** Thursday, July 11, 2019 12:00 PM-1:30 PM (UTC-06:00) Central Time (US & Canada).
**Where:** TBD

4



September 20, 2019

Attention: Cyril Grasso; Charles W. Kennedy, IV; and Michael Coulter

Trans Audit, Inc.
200 West 58th Street
New York, NY 10019

Dear Cy, Chad, and Mike:

I had the pleasure of speaking with Chad on the phone earlier this year, but I have also heard from the Condata team how much everyone respects you all and the business that you have built over the years. I hope that I get a chance to meet you all soon.

As you may be aware, Condata is backed by NextGen Growth Partners, a private investment firm based in Chicago. As a part of a significant investment that NextGen made into Condata over a year ago, I joined the team here as CEO. Over the last year I've continued to research our market, learn from our customers, and grow further convicted in the opportunities ahead of the freight post audit industry. Moreover, I've come to believe that Trans Audit and Condata can do more to serve our clients and expand the market together than each company can do alone.

Would you all be against having a discussion of how a merger between our companies could provide significant value to our customers, employees, and equity partners?

We can structure a transaction to work for each of you. I know that partners can have different desires for near-term liquidity and different visions of what their specific operating roles in a company look like after a deal. With our base of long-term capital, we can customize a transaction to meet each of your needs and visions. For example, while Trans Audit and Condata together will be a strong, long-term investment, we would be happy to facilitate a merger through all cash, all stock, or a mix of cash and stock consideration, depending on your requirements.

Trans Audit and Condata are a perfect strategic fit within the industry. In addition, I have committed to a multi-year, multi-million-dollar investment in our technology that will drive innovation, operational efficiencies, and revenue growth long into the future. If we can pair that investment with an investment in a partnership between us, I know that Trans Audit and Condata will be able to grow significantly and achieve great things together. I hope you'll consider a conversation – I am happy to talk at your convenience.


Sincerely,

Dave Newberry
CEO
Condata

656 W. Randolph St, Suite 400 | Chicago, IL 60661

5



## PC, Data, and Phone Protection & Security Policy – Revised April 2019

1) *Trans Audit issued PCs and phones are for corporate and business use only. Only programs authorized by Trans Audit are to be installed on any Trans Audit issued PC. No personal programs or apps should be loaded on either of these devices, especially music, shopping, and social media, with the exception of LinkedIn which can be accessed from your PC's browser.*

2) *Trans Audit issued equipment and software are only to be utilized by Trans Audit staff.*

3) End users are not to install software on their PCs or cell phones without IT's written permission to do so. In the event that additional software is desired or necessary to improve business functions or efficiency, it must be presented to Mike Coulter prior to installation. After the software has been reviewed and certified as compatible with Trans Audit's environment and security parameters, IT will install the software, unless express permission is granted to the end user to perform the installation.

4) Users are not to allow third party access to Trans Audit's PCs or phones. This includes any Client, Client representative and or 3rd party entity, other than Trans Audit that may remote into a system to make corrections, resolve problems, install software, examine configurations, etc. Only Trans Audit's IT staff can make modifications to Trans Audit's equipment. In the event that any entity, inclusive of Microsoft, wants to access a Trans Audit device, IT must be contacted immediately and third party access is not to be granted without IT's supervision and involvement.

5) All hardware, software, and data on Trans Audit's PCs are the sole property of Trans Audit and are to be maintained in good working order and subject to the conditions of this Policy and any other provisions that Trans Audit may communicated from time to time.

6) Remote access to Trans Audit's PCs or systems should only take place *through the corporate VPN or via gotomypc.com,* as installed by Trans Audit. VPN software and access should only be utilized on and from Trans Audit issued PCs.

7) History for all browsers used, inclusive of browsing history, download history, cookies, cache, passwords, form data, content settings, app data, media licenses, etc. should be cleared no less than per day, but more often, if you are accessing any sensitive information. Please note that this will also keep your PC and browser running quicker and more efficiently.

8) When not actively using a browser, shut it down to prevent potential intrusion and outside data collection. Do not leave multiple browser and program windows open when your PC is unattended, as this increases exposure to outside intrusion.

9) Virus and malware detection software, such as Windows Defender, is to be kept active at all times. Virus protection should not be suspended or deactivated, and daily virus and malware scans should be run. Daily scans can be set up automatically within Windows Defender. Windows Defender is Trans Audit's authorized virus and malware detection software.

10) *Passwords are not to be saved in your browser or on Sticky notes or any visible media or equipment on or near your PC.*

Passwords should be a minimum of 10, but preferably 12, characters inclusive of caps, numbers, and special characters where the program or site allows.

11) If you are not located in an office where your "Documents" folder is automatically backed up to the server, please ensure that you are set up to back up your "Documents" folder at the end of each day. Trans Audit provides external USB hard drives for this purpose and the hard drives come with backup software that you can install.

12) PCs should be _shut down daily_ to clear cache and memory.  PCs that will _not_ be accessed remotely overnight or over the weekend must be shut down before you leave your workplace.  This prevents overnight hacking and ensures proper PC maintenance and efficient PC operation.

13) Monitors should be turned off when you leave your workplace.

14) Though company issued cell phones can be used for personal calling and texting, **_no social media or music apps should be installed or accessed from those phones_**.  Cell phones, especially social media, have become the hacking community's source of information to facilitate penetration of systems and the insertion of ransomware and malware.

15) Trans Audit reserves the right to access any of its corporate issued PCs or phones at any time with or without prior notice  The installation of unauthorized software, apps, music, social media, etc. on any Trans Audit device that results in any degradation or involvement from Trans Audit's IT staff may, at Trans Audit discretion, _be subject to back-charging for the time and effort expended by IT to correct and or remove any such unauthorized software or hardware._







**DONNELLY**
**+ GROSS**

*Attorneys and Counsellors at Law*

*GAINESVILLE OFFICE:*
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
352. 374. 4001
FAX: 352. 374. 4046

*FORT MYERS OFFICE:*
5237 Summerlin Commons Blvd., Suite 236/238
Fort Myers, FL 33907
239. 226. 4001
FAX: 352. 374. 4046

October 25, 2019

**PRIVATE & CONFIDENTIAL**

**VIA U.S. MAIL & OVERNIGHT FEDERAL EXPRESS**

Kristy Bishop
6024 Addington Drive NW
Acworth, GA 30101

      Re:   NOTICE OF INTENT TO ENFORCE
             NONCOMPETE AGREEMENT

You will please take notice:

      We represent Trans Audit, Inc. in the enforcement of its written employment agreement with you, a copy of which was previously provided to you and is enclosed in this letter. As you know, your last day of employment with Trans Audit was on October 18, 2019.

      We are writing this letter to remind you about your post-employment contractual obligations to Trans Audit, an issue that is of particular concern to Trans Audit given your refusal and failure to identify your subsequent work-related arrangements, your deletion of all work-related text messages and voicemail from your cell phone, and your return of your PC without your password which is required to access work-related information thereon. Your lack of transparency with regard to your future business engagement and deletion of company records, suggests possible deception and/or an intent on your part to violate the employment agreement.

You signed this agreement which, for two years following separation from employment expressly prohibits you from (1) directly or indirectly, on your behalf or on the behalf of any other person or entity, engaging in a business that is similar to Trans Audit's cost management business and/or (2) soliciting Trans Audit's clients, prospects or staff or hire its employees.

The agreement also prohibits you from, at any time, directly or indirectly using, divulging, communicating or disclosing to a third party any of Trans Audit's confidential information for any purpose. Confidential information is broadly defined in the employment agreement to include, without limitation, clients, client names, ideas, concepts, techniques, trade secrets, know-how, computer programs and records, marketing strategies and development, pricing, product development, strategic plans, software design and/development documents, source and object code, files, tapes, diskettes, data, reports, research, business plans, financial information and intellectual information (described in paragraph 10) and other information/documents which give Trans Audit a competitive advantage over its competition.

Further, the agreement requires that you immediately (1) return to Trans Audit its confidential information and/or intellectual property, in whatever form, which remain in your possession or control, including without limitation all electronic files, copies and reproductions, and all compilations, summaries or other work papers and (2) cease and desist from using all Trans Audit information, programs and auditing tools or copies thereof and return such information, programs and tools, including all copies, to Trans Audit.

In the event you breach the restrictive covenants in your written contract, please be advised that Trans Audit will be forced to seek, as provided by contract and statute, liquidated damages in the amount of all revenues received from such entities for whom services are performed. Additionally, violation of this contract subjects you to injunctive restriction (i.e. court-ordered restriction that you may not perform work which competes with Trans Audit for two years); an accounting of all earnings, profits or other benefits you have acquired as a result of such breach; monetary damages; attorney's fees and costs, and other legal remedies.

2

To avoid an inference that you are in fact in working in violation of the noncompete, you must confirm to me in writing to me before 5:00 p.m. on October 31, 2019, your current work-related or business engagement or employment along with the following confirmations, as well as the password to your PC:

(1)    you have returned all of Trans Audit's programs, tools, documents, confidential information, and property, including all copies, to Trans Audit and have retained nothing in your possession;

(2)    you have not used nor disclosed and you will never use nor disclose confidential information and/or intellectual property of Trans Audit to a third party;

(3)    you have not directly nor indirectly, on your behalf or on the behalf of any other person or entity, engaged in a business that is similar to Trans Audit's cost management business and you will not do so for two years following the termination of your employment;

(4)    you have not directly or indirectly, on your behalf or on the behalf of any other person or entity, solicited Trans Audit's clients, prospects, staff or employees and you will not do so for two years following the termination of your employment; and

(5)    you have not directly or indirectly guided, given input, or participated in any way in assisting any other person or entity, to interfere with Trans Audit's business in any way and you will not do so for two years following the termination of your employment.

Please be forewarned that Trans Audit intends to fully enforce the contract signed by you, including, but not limited to, the non-compete, non-solicitation, and non-disclosure provisions.

Your failure to immediately take appropriate corrective actions to protect Trans Audit's contractual rights, and confirm the same in writing may leave the company with no alternative but to pursue its legal rights, inclusive of contract enforcement, damages, attorney's fees and costs.

3

If I do not hear from you, we will presume that you are continuing to engage in a potential violation of the contract.

I look forward to hearing from you and resolving this matter.

Sincerely,

Laura A. Gross

Enclosure: Employment Agreement

4

Employment Agreement

This Agreement dated December 9, 2015 is made by and between Trans Audit, Inc. ("Trans Audit"), an actual employer located at 11 Marshall Road, Suite 2D, Wappingers Falls, NY 12590, and Kristy Bishop ("Employee") residing at 112 Creekview Lane Dallas, GA 30157 with Federal Tax Identification Number _____

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Trans Audit and Employee agree as follows:

1. Title: Employee's title shall be Client & Market Development Manager.

2. Commencement Date: Employment as Client & Market Development Manager shall commence on December 28, 2015.

3. Primary Job Responsibilities: Employee's primary responsibilities shall include 1) inside sales (attainment of conference calls and meetings for other sales personnel), 2) direct sales of Trans Audit's cost recovery and reduction services to prospects, 3) sales and marketing support, 4) cross selling of Trans Audit services to Clients brought to Trans Audit by Employee and Clients assigned to Employee by Trans Audit, 5) Client support, 6) support of the carrier claim resolution and payment process for assigned Clients, 7) collection support for outstanding receivables from carriers and Clients, and 8) other work or special projects as assigned by Trans Audit's Executive staff.

4. Base Salary Commencing December 28, 2015, Employee's annual base salary shall be $35,000 based on a minimum of 40 hours worked per week.

5. Contingent Compensation: Unless Employee breaches this Agreement, Employee shall be entitled to receive additional compensation or commission equal to; a) 10% of Net Collected Fees for services for which Employee directly delivered a contract for such services to Trans Audit, b) 5% of Net Collected Fees derived from jointly developed accounts, whereby the account was closed by Employee in conjunction with another salesperson, c) $100.00 one time for each meeting or conference call set up with a potential Client by Employee and thereafter conducted by other Trans Audit personnel, d) $250.00 one time for each contract closed with an account which Employee established the initial conference call or meeting with the potential Client, and or e) 3.0% of Net Collected Fees for each post audit contract closed by Trans Audit with an account for which Employee established the initial conference call or meeting with the potential Client.  One time per call, per meeting and per contract compensation shall be paid to Employee biweekly in conjunction with Trans Audit's payroll processing policies.  "Net Collected Fees" are defined as Trans Audit's revenue (typically), refund received times Trans Audit's contingency rate with the Client, less third party fees, if any) for which Trans Audit has received payment from the Client.  Commission due to Employee will be paid in the second calendar month after the Client is invoiced and in the payroll run closest to the fifteenth of the month.  Monthly commission reports will be provided to Employee by Trans Audit.  Trans Audit may withhold a commission payment until such time a Client pays an invoice.  If Trans Audit has reason to doubt that the Client will not pay said invoice.  No commission shall be owed by Trans Audit with respect to fees collected by Trans Audit greater than six (6) months after the termination date of this Agreement, or fees payable by Clients but not actually received by Trans Audit.  Employee shall promptly reimburse Trans Audit for any commissions for invoices which Client does not pay Trans Audit or for commissions paid for fees received by Trans Audit, but subsequently refunded to the Client for any reason.  Reimbursable fees or commissions may be netted from future commission payments.

6. Benefits: Medical and Dental Insurance as per Trans Audit's existing plans.  Employee shall be entitled to three (3) weeks paid vacation.  The first vacation week may be taken after six (6) months of employment and the subsequent weeks after nine (9) months of employment.

7. Company Equipment & Software:  Trans Audit shall provide Employee with a laptop, docking station, monitors, multifunction machine, cell phone, and high speed internet access.  Any and all equipment and software provided to Employee by Trans Audit shall remain the property of Trans Audit and Employee shall have the right to use such equipment and software solely during the term of this Agreement.  Employee shall use reasonable care and ensure that all equipment and software remains in good condition and repair.  In the event of termination of this Agreement for any reason, Employee shall immediately return to Trans Audit all equipment and software in Employee's possession.  All equipment and software shall be returned to Trans Audit in good working order with all peripherals and all electronic and program files intact.

8. Expenses:  Trans Audit shall reimburse Employee for all reasonable business and travel expenses provided such expenses are necessary to support Employee's responsibilities and in accordance with Trans Audit's policies.

9. Confidentiality: For purposes of this Agreement, "Confidential Information" shall mean this Agreement and Trans Audit's or its Client's information in any and all forms (including without limitation Trans Audit's Clients, Client names, ideas, concepts, techniques, trade secrets, know-how, computer programs and records, marketing strategies and development, pricing, product development, strategic plans, software design and/or development destinations, source and object code, files, tapes, diskettes, data, reports, research, business plans, financial information, Client names, notes, work papers, lists, contracts, sales information, [marketing information or materials,] documents, implementation plans, market research, technical research, inventions, patent applications, evaluations, benchmarks, test results, identities of employees, partners, suppliers and/or competitors, or other information of a competitive nature) relating to the business of Trans Audit or their products or services, if received or acquired by Employee in connection with this Agreement, or regarded by Trans Audit as proprietary and confidential. Notwithstanding the foregoing, Employee agrees that it shall not, directly or indirectly, use, divulge, communicate, or disclose to a third party any of Trans Audit's Confidential Information for any purpose. Promptly, but in no event more than ten (10) days after the termination of this Agreement or after any request of Trans Audit, Employee shall return to Trans Audit via traceable means, such as Federal Express, all Confidential Information in whatever form in Employee's possession or control, including without limitation, all electronic files, copies and reproductions, and all compilations, summaries or other work papers. The terms and conditions of this section shall survive termination of the Agreement.

10. Intellectual Property. For purpose of this Agreement, "Intellectual Property" shall mean any (i) inventions, discoveries, improvements, ideas, designs, developments, concepts, techniques, marketing techniques, processes, technology or know-how (whether patentable or not), (ii) works of authorship, claims, cost reduction strategies, copyrightable or trademark material; (iii) trade secrets; and (iv) information and data related to, forming the basis for, or arising from items (i) through (iii) above. Each party acknowledges and agrees that the Intellectual Property arising out of or relating to the services provided by Employee shall be owned solely and exclusively by Trans Audit. Nothing in this Agreement shall convey to Employee any right, title, license or interest in Trans Audit's Intellectual Property whether preexisting or developed during or under this Agreement. All programs or auditing tools provided to Employee shall remain the property of Trans Audit and Employee agrees to solely utilize such programs or tools to solely perform services for Trans Audit and Trans Audit's Clients. Employee shall immediately cease use of and return all programs and tools to Trans Audit at Trans Audit's request or upon termination of this Agreement. The terms and conditions of this section shall survive termination of the Agreement.

11. Non-Compete & Non-Solicitation. Employee agrees that during the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, Employee shall not, directly or indirectly, by itself or on behalf of any other individual, partnership, firm, corporation or other business entity, engage in a business that is similar to Trans Audit's cost management business. The preceding restriction shall not apply to the preexisting freight audit and payment (pre-audit) expertise of Employee. In the event that Employee does not adhere to the provisions of this paragraph 11 and Employee performs services for Trans Audit's Clients, their divisions or affiliates or for prospects of Trans Audit, Employee shall pay to Trans Audit as liquidated damages, all revenues received from such entities for which services were performed. Employee shall not during the term of this agreement and for a period of two (2) years after termination of this Agreement for any reason, solicit Trans Audit's Clients, prospects or staff, or hire employees or Employees of Trans Audit. Trans Audit will be entitled to obtain injunctive relief to protect and enforce its rights herein and shall be further entitled to an accounting of all earnings, profits or other benefits acquired by Employee as a result of such breach in addition to any and all remedies available at law without the need to post a bond or other undertaking. Trans Audit in any dispute hereunder shall be entitled to recover reasonable attorney fees and costs.

12. Remedies. Employee agrees that a breach of the Intellectual Property, Confidentiality and Non-Compete & Non-Solicitation provisions of this Agreement will cause Trans Audit irreparable damage for which recovery of money damages alone would be inadequate. Therefore, Trans Audit will be entitled to obtain injunctive relief to protect and enforce its rights hereunder in addition to any and all remedies available at law without the need to post a bond or other undertaking. Trans Audit in any dispute hereunder shall be entitled to recover reasonable attorney fees and costs.

13. Modifications. Trans Audit reserves the right to modify this Agreement as necessary to support its business objectives or special circumstances.

14. Performance Restrictions. Employee represents and warrants to Trans Audit that Employee is not obligated or restricted under any agreement (including any non-competition or confidentiality agreement), judgment, decree, order or other restraint of any kind, which could impair Employee' ability to perform the duties and

obligations required of Employee hereunder, or create a material liability for Trans Audit. Employee will hold Trans Audit harmless for all actions resulting from prior infringement on Employee's ability to perform work under this Agreement.

For Trans Audit

Chad W. Kennedy, IV

Date: 12/11/15

Krista Bishop- Employee

Date: 12-11-15

### Addendum 1 – Sales Qualifications & Criteria

Sales compensation as set forth in Section 5 of the Employment Agreement will be based upon the fulfillment of each the following criteria.

1.1.   To qualify for sales compensation, all accounts must be pre-approved by Trans Audit to prevent conflict with Trans Audit's sales personnel and agents. Before initiating contact with any referral account, Employee shall obtain written approval from Trans Audit. Once a referred account has been approved by Trans Audit it shall be deemed an "Approved Account". Additionally, Trans Audit shall indicate in writing its services approved for marketing (the "Approved Services") to the Approved Account(s). Only Approved Services for Approved Accounts shall be subject to compensation.

1.2.   A "Jointly Developed Account" shall mean the following.

1.2.1.   Employee has developed the initial relationship with the Approved Account;

1.2.2.   The initial relationship is with an individual capable of making the "buy decision" for the Approved Services as applicable;

1.2.3.   Employee has discussed, and determined initial interest in, the other party's services with the Approved Account;

1.2.4.   Employee facilitates, participates in and assists with conference calls or meetings by and between the Approved Account and Trans Audit to discuss Trans Audit's services; and

1.2.5.   Employee assists where requested throughout the sales process, including but not limited to additional sales discussions, meetings and/or phone calls, contract negotiations and other general sales follow-up activities.

1.2.6.   Employee or Trans Audit ascertains an executed contract from the Jointly Developed Account.

1.3.   A "Referral Lend" shall mean the following:

1.3.1.   Employee has developed some type of initial relationship with the Approved Account;

1.3.2.   The initial relationship is with an individual capable of making the "buy decision" for the Approved Services as applicable; and

1.3.3.   Employee facilitates an introduction to the Approved Account, at least by way of conference call, of Trans Audit that leads to a contract between the Approved Account and Trans Audit.



**DONNELLY**
**+ GROSS**

*Attorneys and Counsellors at Law*

*GAINESVILLE OFFICE:*
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
352. 374. 4001
FAX: 352. 374. 4046

*FORT MYERS OFFICE:*
5237 Summerlin Commons Blvd., Suite 236/238
Fort Myers, FL 33907
239. 226. 4001
FAX: 352. 374. 4046

November 7, 2019

## PRIVATE & CONFIDENTIAL

## VIA U.S. MAIL & OVERNIGHT FEDERAL EXPRESS

Kristy Bishop
6024 Addington Drive NW
Acworth, GA 30101

> Re:   **SECOND WARNING**: NOTICE OF INTENT TO ENFORCE
> NONCOMPETE AGREEMENT

You will please take notice:

This is a Second Warning to you regarding Trans Audit's intent to enforce its written employment agreement with you. As you know, the contract prohibits you from engaging in the following activities until October 18, 2021 (two years from your last day of employment): (1) directly or indirectly, on your behalf or on the behalf of any other person or entity, engaging in a business that is similar to Trans Audit's cost management business and/or (2) soliciting Trans Audit's clients, prospects or staff or hire its employees, as well as other restrictions.

As you have not responded to our letter of October 25, 2019, we now presume that you are in violation of the contract. If that is not the case, we suggest you respond immediately to me with the information I requested in my letter to you of October 25. Regardless of your current work activities, you are obliged to provide a copy of the contract to your new employer to inform them of your work restrictions and the related potential impact on them.

Sincerely,

Laura A. Gross

7



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
vedderprice.com

Jeanah Park
Shareholder
+1 312 609 7532
jpark@vedderprice.com

November 22, 2019

**VIA E-MAIL AND U.S. MAIL**
Laura A. Gross
Donnelly Gross
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
laura@donnellygross.com

Re:   **Kristy Bishop**

Dear Ms. Gross:

This firm represents Kristy Bishop ("Ms. Bishop").  Ms. Bishop has requested that I respond to your letters of October 25 and November 7, 2019 (the "Letters").  In these letters, you assert that Ms. Bishop purportedly deleted certain work-related text messages and voicemails from her cell phone and returned her "PC" without a password.  You also remind Ms. Bishop that she is bound by a December 2015 agreement with Trans Audit, Inc. ("Trans Audit") that contains certain post-employment non-compete, customer and employee non-solicitation obligations (the "Agreement").  You also request certain assurances from Ms. Bishop

I have reviewed the Agreement and the Letters, and discussed these matters with Ms. Bishop.  As an initial matter, I have serious reservations as to the enforceability of the post-employment non-compete and non-solicitation covenants contained in the Agreement as applied to Ms. Bishop.  For example, the non-compete provision prohibits Ms. Bishop from working for **any** business in the cost management business **in any capacity**.  This would prohibit Ms. Bishop from working in her chosen profession, which any Georgia or other court would be reluctant to allow.  *See* O.C.G.A. § 13-8-53 (providing that non-compete provision must be reasonable in time, geographic area and scope of prohibited activities).  Additionally, the non-solicitation provision prohibits Ms. Bishop from soliciting any of Trans Audit's "Clients, prospects or staff."  The terms "soliciting," "Clients, "prospects," and "staff" are not defined, and presume that Ms. Bishop is prohibited from soliciting any Trans Audit clients, prospective clients, or staff, including clients and employees with whom Ms. Bishop had absolutely no contact while employed by Trans Audit.  Such a provision is not enforceable under Georgia law.  *Trujillo v. Great S. Equip. Sales, LLC* 289 Ga. App. 474, 477 (Ga. Ct. App. 2008) (noting that "Georgia law is clear that unless the nonsolicitation covenant pertains *only to those clients with whom the employee had a business relationship* during the term of the agreement, the nonsolicitation covenant must contain a territorial restriction.") (Emphasis in original.)  Given the lack of definition and overbreadth of the non-solicitation provision, Ms. Bishop would have no way of knowing if any entity was a Trans Audit "Client" or prospect or not.  In short, we do not believe the non-solicitation and non-competition provisions in the Agreement are enforceable.  In any event, Ms. Bishop has not violated either provision.

With regard to the confidentiality provision, as you know, Ms. Bishop returned all Trans Audit information and property immediately after her last day of work on October 18, 2019.  As to your assertion that Ms. Bishop deleted information from her phone, Ms. Bishop regularly deletes voicemails

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales. Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore

Laura A. Gross
November 22, 2019
Page 2

in the ordinary course of her business and did not delete any work-related text messages.  Ms. Bishop did not change or add a password to her Trans Audit-issued laptop, nor would she have the ability to do so because she does not have administrative rights to the laptop.  Finally, Ms. Bishop does not possess any Trans Audit Confidential Information and therefore cannot use or disclose any such information.[1] Ms. Bishop has confirmed that she has not directly or indirectly divulged, communicated, or disclosed any Trans Audit Confidential Information to any third party.  If you have any specific information to the contrary, please notify me immediately.

We trust that the assurances provided herein address your concerns.  If you have any questions or should you request additional information, please feel free to contact me at (312) 609-7532.

Very truly yours,

Jeanah Park

JP/dm

---

[1]  Capitalized terms not defined herein shall have the definitions assigned to them in the Agreement.



**DONNELLY**
**+ GROSS**

Attorneys and Counsellors at Law

*GAINESVILLE OFFICE:*
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
352. 374. 4001
FAX: 352. 374. 4046

*FORT MYERS OFFICE:*
5237 Summerlin Commons Blvd., Suite 236/238
Fort Myers, FL 33907
239. 226. 4001
FAX: 352. 374. 4046

December 19, 2019

## PRIVATE & CONFIDENTIAL

## VIA FEDERAL EXPRESS OVERNIGHT DELIVERY

Condata Global Inc.
Dave Newberry, CEO
9830 190th St
Mokena, IL 60448

Firmament Group
Christopher Smith, President
1 Rockefeller Plaza
Suite 1203
New York, NY 10020

NextGen Growth Partners
Brian O'Connor, Managing Partner
656 W. Randolph St.
Suite 400
Chicago, IL 60661

Re:  NOTICE OF INTENT TO ENFORCE
NONCOMPETE AGREEMENT

You will please take notice:

We represent Trans Audit, Inc. in the enforcement of (1) its written employment agreement with former employee Kristy Bishop, and (2) its claim against Condata Global, Inc. and its parent or affiliated corporations (together referred to herein as "Condata") for tortious interference with this contractual relationship.  Enclosed is a copy of Trans Audit's employment agreement with Bishop.

Bishop signed this agreement which prohibits her from engaging in the following activities until October 18, 2021 (two years from her last day of

employment): (1) directly or indirectly, on her behalf or on the behalf of any other person or entity, engaging in a business that is similar to Trans Audit's cost management business and/or (2) soliciting Trans Audit's clients, prospects or staff or hire its employees, as well as other restrictions. A violation of this agreement subjects Bishop and her future employers to damages, attorney fees and costs, and other legal remedies.

Trans Audit has previously put Bishop on notice that it intends to fully enforce the employment agreement signed by Bishop including, but not limited to, the non-compete provision and that she must provide a copy of the contract to her new employer to inform them of her work restrictions and the related potential impact on them. Nevertheless, Trans Audit has learned that Condata, which directly competes with Trans Audit in the same line of business, has willfully hired Bishop, in violation of the agreement. By such actions, not only is Bishop in breach of the restrictive covenants in the written employment agreement, but Condata will also be liable for knowingly and intentionally interfering with the contract between Trans Audit and Bishop.

This breach and intentional interference must be corrected immediately. Please confirm in writing to me by the close of business on Friday, December 27, 2019, that Condata will not interfere with the contract between Trans Audit and Bishop by employing Bishop during the restrictive period, in violation of the agreement.

Condata's failure to provide a written confirmation or assurances will leave Trans Audit with no alternative but to pursue its legal rights against both Bishop and Condata for contract enforcement, damages, attorney fees and costs.

I look forward to hearing from you and resolving this matter.

Sincerely,

Laura A. Gross

Encl.

2



**DONNELLY**
**+ GROSS**

*Attorneys and Counsellors at Law*

*GAINESVILLE OFFICE:*
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
352. 374. 4001
FAX: 352. 374. 4046

*FORT MYERS OFFICE:*
5237 Summerlin Commons Blvd., Suite 236/238
Fort Myers, FL 33907
239. 226. 4001
FAX: 352. 374. 4046

December 19, 2019

**PRIVATE & CONFIDENTIAL**

**VIA FEDERAL EXPRESS OVERNIGHT DELIVERY**

Jeanah Park
VederPrice
222 North LaSalle Street
Chicago, Illinois 60601

      Re:   Kristy Bishop
           NOTICE OF INTENT TO ENFORCE
           NONCOMPETE AGREEMENT

Dear Ms. Park:

      I am in receipt of your letter dated November 22, 2019.

      First, the restrictive covenants contained in Ms. Bishop's contract with Trans Audit are absolutely enforceable. Although we believe Florida law would apply, the contractual restrictions to which Ms. Bishop agreed are enforceable under either Florida or Georgia law, and your purported reservations regarding enforceability are not well taken.

      Second, the assertion that Ms. Bishop has not violated the non-solication and non-competition provisions of the Agreement, is false. As we have previously reminded Ms. Bishop, the contract prohibits Ms. Bishop from engaging in the following activities until October 18, 2021 (two years from her last day of employment): (1) directly or indirectly, on her behalf or on the behalf of any other person or entity, engaging in a business that is similar to Trans Audit's cost management business and/or (2) soliciting Trans Audit's clients, prospects or staff

1

or hire its employees, as well as other restrictions.   We have recently learned that Ms. Bishop is working for Condata Global, Inc., a direct and primary competitor engaged in the same line of business as Trans Audit.   Ms. Bishop's prior deceptive conduct and failure or refusal to provide assurances against breach and the recent information that she is, in fact, working for a direct competitor confirm her direct and blatant breach of her contractual obligations.

Third, in additional to specialized training and substantial relationships with specific prospective or existsing clients, Ms. Bishop was provided valuable confidential and proprietary business information and trade secrets belonging to Trans Audit which justify the the restrictive convenants.   The disclosure to, and use of such confidential and proprietary information and trade secrets by or on behalf of, a direct competitor will give the competitor an unfair business advantage and will be detrimental to Trans Audit's business. See Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223 (11th Cir. 2009) (receipt of valuable confidential business information was not limited to physical materials and the fact that former employee had access to such information which he could use in his new position with a direct competitor provided a basis to enforce the non-compete covenant).

It is clear that Ms. Bishop has breached her contract and misappropriated Trans Audit's legitimate business interests including but not limited to confidential and proprietary business information, specialized training, prospects and customer relationships.   It is imperative that she immediately cease and desist from engaging in activites prohibited by the contract. We have previously notified Ms. Bishop of Trans Audit's intent to enforce its written employment agreement with her. Moreover, Contada and its parent or affiliated corporations, will also be liable for tortious interference with a contractual relationship by permitting and/or encouraging Ms. Bishop to knowingly and willfully breach her contract.

Please provide confirmation by the close of business on Friday, December 27, 2019 that Ms. Bishop will cease and desist from engaging in activites prohibited by the contract.

Sincerely,

Laura A. Gross

2



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
vedderprice.com

December 27, 2019

Jeanah Park
Shareholder
+1 312 609 7532
jpark@vedderprice.com

**VIA E-MAIL AND U.S. MAIL**
Laura A. Gross
Donnelly Gross
2421 NW 41st Street, Suite A-1
Gainesville, FL  32606
laura@donnellygross.com

Re:    **Condata Global Inc. and Kristy Bishop**

Dear Ms. Gross:

This firm represents Condata Global Inc. ("Condata") and Kristy Bishop ("Ms. Bishop").  Condata and Ms. Bishop have requested that I respond to your letters dated December 19, 2019 (the "Letters").  In these letters, you assert that your client has learned that Ms. Bishop is employed with Condata and that her employment with Condata violates the December 2015 agreement with Trans Audit, Inc. ("Trans Audit") that contains certain post-employment non-compete, customer and employee non-solicitation obligations (the "Agreement").

I have reviewed the Letters, and discussed these matters with Condata and Ms. Bishop.  As an initial matter, as I stated to you before in my letter dated November 22, 2019 ("November 22 Letter"), I have serious reservations as to the enforceability of the post-employment non-compete and non-solicitation covenants contained in the Agreement as applied to Ms. Bishop.  For example, the non-compete provision prohibits Ms. Bishop from working for **any** business in the cost management business **in any capacity**.  This would prohibit Ms. Bishop from working in her chosen profession, which any Georgia or other court would be reluctant to allow.  *See* O.C.G.A. § 13-8-53 (providing that non-compete provision must be reasonable in time, geographic area and scope of prohibited activities).  Additionally, the non-solicitation provision prohibits Ms. Bishop from soliciting any Trans Audit's "Clients, prospects or staff."  The terms "soliciting," "Clients, "prospects," and "staff" are not defined, and presume that Ms. Bishop is prohibited from soliciting any Trans Audit clients, prospective clients, or staff, including clients and employees with whom Ms. Bishop had absolutely no contact while employed by Trans Audit.

I do not agree with your contention that Florida law would apply to the Agreement.  Your reliance on *Proudfoot Consulting Company v. Gordon*, 576 F.3d 1223 (11th Cir. 2009) is misplaced because unlike the Agreement, the employment agreement in *Proudfoot* specifically stated that it is governed by Florida law.  (*See Proudfoot Consulting Company v. Gordon*, No. 06-cv-80959, ECF No. 95-2, ¶ 16.) Moreover, the post-employment restrictions in the agreement at issue in *Proudfoot* applied for only six months and were otherwise different from the restrictions in the Agreement.  Given the lack of definition and overbreadth of the non-solicitation provision, Ms. Bishop would have no way of knowing if any entity was a Trans Audit "Client" or prospect or not.  In short, we do not believe the non-solicitation and non-competition provisions in the Agreement are enforceable under either Florida or Georgia law.

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

Laura A. Gross
December 27, 2019
Page 2

Even assuming for the sake of argument that the post-employment covenants in the Agreement are enforceable (which they are not), Trans Audit can be assured that its legitimate business interests are not threatened by Ms. Bishop's work for Condata. It has been—and remains—a condition of Ms. Bishop's employment with Condata that she abide by all obligations to third parties, including Trans Audit. Ms. Bishop has not engaged in any activities on behalf of Condata in violation of the terms of her Agreement. For example, the non-competition provision in the Agreement states that it does not apply to the "preexisting freight audit and payment (pre-audit) expertise of" Ms. Bishop. In her employment with Condata, Ms. Bishop is working in a capacity related to her preexisting freight audit and payment expertise, and has not solicited and does not intend to solicit any Trans Audit customers she serviced while employed by Trans Audit.

In your December 19, 2019 letter to Ms. Bishop, you assert that "it is clear" that Ms. Bishop has "misappropriated Trans Audit's legitimate business interests including but not limited to confidential and proprietary business information, specialized training, prospects and customer relationships." However, as you know, in my November 22 Letter, I informed you that Ms. Bishop returned all Trans Audit information and property immediately after her last day of work on October 18, 2019 and that Ms. Bishop does not possess any Trans Audit Confidential Information and therefore cannot use or disclose any such information.[1] I also confirmed to you that Ms. Bishop has not directly or indirectly divulged, communicated, or disclosed any Trans Audit Confidential Information to any third party, including to Condata. I asked you to provide any specific information to the contrary, yet you have been unable to do so.

I am hopeful that our clients can move forward such that Ms. Bishop is complying with her Agreement and does not possess any Trans Audit Confidential Information; that Condata does not have possess, and will not use, any Trans Audit Confidential Information; and that Trans Audit recognizes that it cannot inhibit ordinary competition. I also trust the above will address your client's concerns. However, if there are specific matters that you believe we should discuss, or any facts of which you are aware that call into dispute any of the above, please contact me as soon as possible.

Condata and Ms. Bishop do not waive, but expressly reserve, all rights and remedies.

Very truly yours,

Jeanah Park

JP/dm

---

[1] Capitalized terms not defined herein shall have the definitions assigned to them in the Agreement.



**DONNELLY**
**GROSS**

*Attorneys and Counsellors at Law*

*GAINESVILLE OFFICE:*
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
352. 374. 4001
FAX: 352. 374. 4046

*FORT MYERS OFFICE:*
5237 Summerlin Commons Blvd., Suite 236/238
Fort Myers, FL 33907
239. 226. 4001
FAX: 352. 374. 4046

January 14, 2020

**<u>PRIVATE & CONFIDENTIAL</u>**

**VIA US MAIL AND EMAIL to jpark@vedderprice.com**

Jeanah Park
VedderPrice
222 North LaSalle Street
Chicago, Illinois 60601

> Re:    Trans Audit, Inc. v. Condata Global, Inc. and Kristy Bishop
> **SECOND** NOTICE OF INTENT TO ENFORCE RESTRICTIVE
> COVENANTS

Dear Ms. Park:

I am in receipt of your letter dated December 27, 2020. Contrary to the unsupported and inconsistent allegations in your letter, the evidence demonstrates that Ms. Bishop is, in fact, violating the restrictive covenants contained in her contract with Trans Audit and Condata Global, Inc. is enjoying the benefits of its tortious interference with this contract.

If we cannot amicably resolve this and receive the guarantees set forth herein, we will sue your clients in Florida. Again, the restrictive covenants are absolutely enforceable under Florida law, which we believe applies, as well as Georgia law. The tenets of <u>Proudfoot Consulting Company v. Gordon</u>, 576 F. 3d 1223 (11th Cir. 2009), of course, will apply. Your purported reservations regarding the enforceability of the contract based on its language are not well taken.

Likewise, your allegations about Ms. Bishop's work on behalf of Condata are unsupported and inconsistent with the facts. In your clients' defense, you rely on the contract language that recognizes Ms. Bishop had "preexisting freight audit and payment (pre-audit) expertise" before she was hired with Trans Audit and allows her to use this pre-audit experience after her employment with Trans Audit, without restriction. This exception for her use of pre-audit experience was made as Trans Audit does not offer pre-audit services. You then allege, "In her employment with Condata, Ms. Bishop is working in a capacity related to her preexisting freight audit and payment expertise…," implying that she provides only pre-audit services for Condata. This allegation is just not true, and it is disturbing and telling that Condata and Ms. Bishop have advised you that it is.

First, Condata does not offer pre-audit services. Condata offers only post-audit services. This is undisputed. On its website, Condata does not reference "pre-audit services." Instead, Condata describes itself as a provider of "post audit freight bill services," "post audit and recovery services," "post audit business" services, and "post audits across all transportation modes." Likewise, Ms. Bishop's LinkenIn page identifies herself as Condata's Vice President of Business & Development Services and describes Condata's services as "post audit services," not pre-audit. Most significantly, Condata admits on its website that it has a: "**Singular Focus**—Freight **post audit is, and always has been, our only service offering**. All of our staff, technology and focus is dedicated to your freight audit."

Second, as Condata's Vice President of Business Development & Strategy, Ms. Bishop is presumably responsible for leading Condata's company planning and execution of strategies to increase sales and company growth of its "Singular Focus"—its post audit services.

Third, to the extent your defense in this matter relies on the recited contract language allowing Ms. Bishop to use her "preexisting freight audit and payment (pre-audit) expertise," that experience is limited to pre-audit services which Condata does not provide. When Trans Audit hired Ms. Bishop, she had only pre-audit experience. Trans Audit trained Ms. Bishop in post-audit services and outside sales, and her employment with Trans Audit provided her post-audit and outside sales expertise. Trans Audit has a legitimate business interest in her post-audit and outside sales training and expertise.

2

Moreover, as Director of Sales & Marketing for Trans Audit, Ms. Bishop received confidential information about, access to, and relationships with Trans Audit's customers and prospective customers. Trans Audit also provided Ms. Bishop confidential information including Trans Audit's strategic marketing plan, data base of customers and prospects which was created as part of its strategic marketing plan, pricing strategies, market analyses, forecasts, sales, trends, training materials, and best practices among other things.

Notably, before Ms. Bishop left employment with Trans Audit, Trans Audit asked her where she would be working and what she would be doing. Not only did Ms. Bishop hide and refuse to provide this information, she knowingly misled Trans Audit by claiming her new employment had nothing to do with what Trans Audit does which we now know is untrue. She also refused to cooperate when asked to call on customers jointly with the employee who would be replacing her, to let customers know of the transition. Instead, she, alone, called on customers to tell them of her departure which is contrary to obligation to protect—and not misappropriate—Trans Audit's legitimate business interests.

When Ms. Bishop left employment with Trans Audit, she took with her Trans Audit's training, relationships with customers and prospects, and confidential information as described above. In her current position as Vice President of Business Development & Strategy for Condata, Ms. Bishop is in a position to misappropriate and use the legitimate business interests of Trans Audit to Trans Audit's detriment. In fact, given her position at Condata, Ms. Bishop's use of Trans Audit's confidential information is inevitable. Also, as Condata's Vice President of Business Development & Strategy, she continues to service and call upon Trans Audit customers and prospective customers—a fact you have not denied.

These facts, including the fact that your clients have attempted to hide Ms. Bishop's employment with Condata and then to describe her work in a manner which is untrue, support Trans Audit's Complaint for Injunctive Relief and Damages. Accordingly, enclosed please find a notice to preserve all related electronically stored information.

Further, if, as you say, Ms. Bishop is not in violation of the restrictive covenants and Condata is not engaged in tortious inference with her contractual obligations to Trans Audit, then Ms. Bishop and Condata CEO Dave Newberry

3

should have no problem (1) providing me true and correct copies of the job description and each document that describes the duties of Condata's Vice President of Business Development & Strategy in effect at any time from October 18, 2019 to date and (2) signing and returning to me by Friday January 17, 2020, their affidavits or sworn declarations attesting to the following:

1.    Kristy Bishop's employment agreement with Trans Audit prohibits her from (1) performing post-audit for a Trans Audit competitor like Condata and (2) soliciting or servicing Trans Audit's clients and prospective clients and (3) soliciting Trans Audit's staff or hiring its employees for a period of two years from her separation from employment with Trans Audit on October 18, 2019.

2.    Kristy Bishop has not performed and will not perform any post-audit service for Condata for two years from October 18, 2019.

3.    Kristy Bishop has not solicited or serviced Trans Audit's clients or prospective clients and will not solicit or service Trans Audit's clients or prospective clients for Condata for two years from October 18, 2019.

4.    Kristy Bishop has not solicited Trans Audit's staff or hired its employees and will not solicit Trans Audit's staff or hire its employees for Condata for two years from October 18, 2019.

5.    Kristy Bishop has not relayed either verbally or in writing, and not used and will never use Trans Audit's confidential information (including but not limited to Trans Audit's strategic marketing plan, data base of customers and prospects which was created as part of its strategic marketing plan, pricing strategies, market analyses, forecasts, sales, trends, training materials, and best practices among other things) in her work for Condata.

6.    Kristy Bishop has not violated and will not violate her employment agreement with Trans Audit, and Condata will not entice her to do so.

7.    Condata has not received and will not receive or accept any Trans Audit information from Ms. Bishop.

8.    Condata has required and will continue to require Ms. Bishop to comply with her employment agreement with Trans Audit in her work for Condata.

9.    Kristy Bishop and Condata have taken the following steps to protect Trans Audit's legitimate business interests while Ms. Bishop is employed by Condata: [describe the steps taken by your clients, if any, to protect Trans Audit's legitimate business interests].

We look forward to receiving this affirmative documentation from your clients on or before Friday, January 24, 2020.

Sincerely,

Laura A. Gross



DONNELLY
+ GROSS

*Attorneys and Counsellors at Law*

GAINESVILLE OFFICE:
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
352. 374. 4001
FAX: 352. 374. 4046

FORT MYERS OFFICE:
5237 Summerlin Commons Blvd., Suite 236/238
Fort Myers, FL 33907
239. 226. 4001
FAX: 352. 374. 4046

March 13, 2020

**PRIVATE & CONFIDENTIAL**

**VIA US MAIL AND EMAIL to jpark@vedderprice.com**

Jeanah Park
VedderPrice
222 North LaSalle Street
Chicago, Illinois 60601

Re:    Trans Audit, Inc. v. Condata Global, Inc. and Kristy Bishop
       **SECOND** NOTICE OF INTENT TO ENFORCE RESTRICTIVE
       COVENANTS

Dear Ms. Park:

This is in response to your email dated March 11, 20, 2020. Again, we are finding ourselves having to remind your clients, and perhaps notify you, that as we speak, Ms. Bishop is, in fact, violating the restrictive covenants contained in her contract with Trans Audit, and Condata Global, Inc. is enjoying the benefits of its tortious interference with this contract.

Specifically, and among other things, Ms. Bishop has engaged in a direct and blatant violation of the Trans Audit Employment Agreement through her solicitation of Ross Stores for Condata Global. During her employment with Trans Audit, Ms. Bishop was involved in communications with Ross Stores and setup a meeting with Ross Stores for Trans Audit right before she left the employ of Trans Audit. We have learned that Ms. Bishop and Condata communicated with Ross Stores and with the same contacts at Ross Stores that she met and worked with while at Trans Audit. As a result, Condata and Bishop have diverted the business away from Trans Audit based upon Bishop's prior contact with Ross Stores as an employee of and for Trans Audit.

Accordingly, both Condata and Bishop willfully and knowingly violated the terms

of the Trans Audit Employment Agreement and the in-progress Settlement Agreement by accepting Ross Stores business while negotiating and delaying its response to the Settlement Agreement. Bishop's and Condata's delay tactics were planned and indicate tortious disregard for the terms of any Agreement and the protection of Trans Audit's legitimate business interests including its customers and prospective customers, intellectual property, trade secrets, and confidential information.

This chain of events involving Ross Stores demonstrates blatant disregard for the Employment Agreement, the proposed Settlement Agreement, and most importantly the protection of Trans Audit's intellectual property, trade secrets, and confidential information, all of which were tortiously utilized to ascertain Ross Stores' business which Trans Audit was actively pursuing while Bishop was employed by Trans Audit and thereafter.

To resolve these matters now, Trans Audit is willing to put aside known violations which would include the Ross violation. But Trans Audit cannot and will not waive its right to enforce the contract as to unknown past violations. If there are no unknown past violations, your clients should have no problem with agreeing to this language.

The bottom line is that these facts give Trans Audit firm footing to sue both Ms. Bishop and Condata and prevail on its claim. And if we cannot amicably resolve this and receive the guarantees set forth in the proposed language, we will sue your clients. Your clients' concern over this language certainly reinforces our belief that there are more such violations by your clients which will be discovered if we must litigate.

We look forward to hearing from you next week on or before Tuesday, March 17, 2020.

Sincerely,

Paul Donnelly



Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
veddervprice.com

March 16, 2020

Jeanah Park
Shareholder
+1 312 609 7532
jpark@vedderprice.com

**VIA E-MAIL AND U.S. MAIL**
Paul Donnelly
Donnelly Gross
2421 NW 41st Street, Suite A-1
Gainesville, FL  32606
paul@donnellygross.com

Re:    **Condata Global Inc. and Kristy Bishop**

Dear Paul:

As you know, this firm represents Condata Global Inc. ("Condata") and Kristy Bishop ("Ms. Bishop").  I write in response to your letter dated March 13, 2020 on behalf of Trans Audit, Inc. ("Trans Audit").

With regard to your assertion that Ms. Bishop has engaged in a "direct and blatant violation" of the December 9, 2015 Employment Agreement with Trans Audit (the "Trans Audit Agreement") through her alleged "solicitation of Ross Stores for Condata Global," there is no basis for your assertion.  First, Ross Stores was not a Trans Audit customer at any time during Ms. Bishop's employment with Trans Audit. Before she left Trans Audit, and in response to a direct request from Mr. Kennedy, Ms. Bishop set up a meeting in October 2019 between Trans Audit's Vikki Van Vliet and Ross Stores.  Ms. Bishop did not attend that meeting and has no knowledge of Trans Audit's efforts to obtain new business from Ross Stores.

Second, to date, Condata does not have a business relationship with Ross Stores.  To be clear, however, to the extent Trans Audit interferes with any prospective relationship between Condata and Ross Stores, such conduct would constitute tortious interference with prospective economic advantage, among other things, and Condata will exercise every remedy to enforce its rights and ensure it is compensated for any damages it suffers as a result of Trans Audit's interference.

With regard to your assertion that Ms. Bishop and Condata have engaged in "delay tactics" by delaying response to the negotiations relating to a potential settlement agreement between the parties, it is your client that has been dragging its feet.  After receiving a proposed settlement agreement from your office on January 30, 2020, I responded in less than one week by sending your associate Cole Barnett our markup on February 5 and requested a time to discuss.  I did not hear back from your office to speak substantively until February 19, at which time we agreed that I would get back to you by February 28.  I then sent you an email on February 26 containing material responses to Trans Audit's issues with our proposed settlement and informed you that our settlement offer remained open for one week, until March 4.  In that email communication, which is attached, I noted that my clients would like to get this matter resolved as soon as possible.

222 North LaSalle Street  |  Chicago, Illinois 60601  |  T +1 312 609 7500  |  F +1 312 609 5005

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, and Vedder Price Pte. Ltd., which operates in Singapore.

Paul Donnelly
March 16, 2020
Page 2

I did not hear back from you until March 10, when you provided another settlement agreement that was nearly identical to Trans Audit's first settlement demand. I responded the next day, March 11, with our markup to the settlement agreement and informed you that time is of the essence.

The record is clear that we have been responsive and diligent in efforts to resolve this matter. Your client, however, has been unreasonable and unwilling to negotiate. While we firmly believe that the restrictive covenants in the Trans Audit Agreement are not enforceable under Florida or Georgia law and that Trans Audit has no evidence whatsoever that Ms. Bishop has violated the Trans Audit Agreement, we remain willing to resolve this matter in accordance with the settlement agreement I sent to you on March 11. As stated before, time is of the essence and we expect to resolve this matter as soon as possible.

Condata and Ms. Bishop do not waive, but expressly reserve, all rights and remedies.

Very truly yours,

Jeanah Park

JP/dm