## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

TRANS-AUDIT, INC.,
      Plaintiff,                       Case No. 1:22-CV-00318-RH-MAF

v.

CONDATA GLOBAL, INC. et al.,
      Defendants,
_____/

## PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AND  SUPPORTING MEMORANDUM OF LAW

Plaintiff TRANS-AUDIT INC., pursuant to Federal Rule of Civil Procedure 37(e), moves this Court for sanctions based on spoliation of evidence as follows.

### PRELIMINARY STATEMENT

Since at least September 2019, Defendants Condata Global, Inc. (Trans Audit's primary competitor) and Kristy Bishop (Trans Audit's then Director of Sales & Marketing) have reasonably foreseen this litigation. It was then that Bishop insisted as a term of accepting a substantially similar position with Condata, that Condata defend her in any litigation brought by Trans Audit. Condata agreed to do so, adding conditions of joint representation, shared legal counsel and Bishop's "cooperation." Bishop then falsely assured Trans Audit that she was not going to work for a competitor and, as a result, was permitted to work her two weeks' notice during which she continued to access Trans Audit's servers.

In the final days of her employment, Bishop connected multiple personal storage data devices to her company-provided computer, accessed Trans Audit's office server and files, and utilized highly effective anti-forensic software to permanently delete records of her computer activity. She exfiltrated a significant amount of data to an external hard drive; however her use of CCleaner to wipe the computer clean made it impossible to determine exactly what she copied. Then, the massive hard drive once in the possession of Bishop and likely containing droves of exfiltrated Trans Audit information, according to Bishop, disappeared.

In October, November and December 2019, and January 2020 and October 2021, Trans Audit notified and reminded Defendants and their shared legal counsel of their obligation to preserve evidence, including electronically stored information (ESI), in anticipation of litigation. Trans Audit also propounded discovery to obtain the devices she used to save those files. Bishop's position shifted. Initially, she said she had no files. Then she admitted she had "one" file. Condata's later document production proved otherwise. And in a November 2020 email produced by Condata, Bishop informed Condata that she had further information from the Trans Audit reports saved on her "hard drive." But when pressed about that at deposition, Bishop claimed the hard drive was in the possession of Defendants' shared attorney's forensic expert. Subsequently, Bishop revised her interrogatory responses to assert the hard drive's location "is not known." Other personal storage devices she attached

to her work computer, identified by Trans Audit's forensic expert by serial number, have similarly gone missing. Forensic reports from both parties show that hard drives were inserted in Bishop's work laptop immediately before she left Trans Audit, and immediately preceding her intentional execution of "disk wipe" software which permanently deleted ESI on her work computer. Defendants not only failed to take reasonable steps to preserve evidence, Bishop attempted to cover their tracks.

These bad faith attempts to conceal Bishop's activities and the subsequent loss of relevant and likely inculpatory data require sanctions including, but not limited to, a finding of prejudice and an intent to deprive, application of an adverse inference in favor of Trans Audit in deciding all motions for summary judgment, and a mandatory adverse inference instruction to the jury.

<u>STATEMENT OF FACTS</u>

1.      Bishop was employed as Trans Audit's Director of Sales & Marketing for which she signed a written employment agreement that contained confidentiality, non-solicitation and non-compete restrictions, and required her to return, and not retain, Trans Audit information upon separation and not to install any programs on her work computer. (Ex. 1). On October 18, 2019, Bishop quit to work in a substantially similar position with Trans Audit's primary and direct competitor, Condata. (Ex. 2). Prior to her departure, Bishop misled Trans Audit to believe that

she would not be working for a competitor. (Ex. 3 (Bishop Dep. 309:2-11, June 13, 2023)).

2.     Before she quit, in anticipation of litigation with Trans Audit, Bishop and Condata secretly reached an agreement whereby Condata would defend Bishop in litigation brought by Trans Audit, and she would agree to joint representation and "cooperation" with Condata. On September 25, 2019, Bishop emailed Condata CEO Dave Newberry:

> Can Condata/you provide me in writing that should Trans Audit or a representative of Trans Audit filing an injunction or other legal filing in correlation to my employment Condata that Condata will provide representation on my behalf?

(Ex. 4). On October 4, 2019, Newberry responded:

> We understand that there is a possibility that Trans Audit may take action against you to enforce the non-compete and non-solicitation in your employment agreement. Condata is willing to have our lawyers respond to any such action on your behalf. If Trans Audit takes action that we need to address, *we will need you to sign a joint representation agreement with our lawyers and cooperate with us*.

(*Id*.) (emphasis added).

3.     In her final days of work for Trans Audit and then unknown to Trans Audit, Bishop connected multiple personal data storage devices to her work laptop, accessed Trans Audit's office server and files, and installed and used highly effective anti-forensic software to permanently delete records of her computer activity. Bishop did not use only one data storage device. Senior Forensic Analyst Robert T.

Rohr determined that the day before Bishop left employment with Trans Audit, she

wiped her work computer of all information prior to returning it:

> ***A common program used to permanently delete and wipe previous activity on a computer called CCleaner was installed on 10/17/2019 … This shows clear intention on permanently deleting any activity that the user did not want to be found. These programs are very effective and do not allow recovery of data…This is evidence of intentional, permanent deletion of data, whether to destroy evidence of exfiltration or activity***. The use of this program is also a direct violation of Bishop's contract and Trans Audit's policies prohibiting users from installing third party software or personal applications on a company owned computer without Trans Audit's IT review and written permission.

(Ex. 5 at 2).

4.    Rohr found that on October 17, 2019, her next to last day, Bishop used

her personal yahoo email to forward herself a copy of a signed Trans Audit NDA

with one of its prospective clients. (*Id.*) Bishop also connected numerous removable

drives to her company laptop including but not limited to Seagate Free Agent Pro

USB Device; USB 2.0 Flash Disk USB Device; WD Easystore 25FC USB Device;

and WD My Passport 0748 USB Device. (*Id.* at p. 3). As stated in Rohr's report,

"[m]any of these drives such as the Seagate and Western Digital are available in

storage capacities ranging from 1TB to 12TB [12 Terabytes] or more." (*Id.*). On her

final day of employment, October 18, 2019, she performed Google searches on the

laptop using the search terms "eraser program" and "ccleaner eraser." (*Id.*) After

reviewing Shellbags artifacts, which are "forensic artifacts commonly found in Microsoft Windows operating systems," Rohr concluded:

> This artifact clearly shows that ***Bishop exfiltrated a significant amount of Trans Audit data to an external storage device/hard drive***. This data is comingled with what appears to be Bishop's personal data. ***The folder structure contained on this drive shows that there are Trans Audit email backups (TA Outlook), client data, company documents and more***.

(Ex. 5 at 4).

5.      Bishop had accessed numerous files relating to projects that she had not worked on and, "[b]ased on the dates and times of these files (several of them being seconds apart) are indicative of the files being copied." (*Id.* at p. 7) However, Bishop's use of CCleaner to wipe the computer rendered it impossible to determine what files she copied with any degree of specificity. Rohr concluded:

> If CCleaner had not been run and these logs were intact, it would display the exact time of insertion and removal for each of these devices, and I would have been able to accurately determine which files were accessed on those dates and times where the logs indicated the insertion and removal of the USB storage devices. …[b]ased on the artifacts and data that were reviewed, there is irrefutable evidence of significant nefarious activity including exfiltration of Trans Audit's confidential company data including, but not limited to, Company Email Backups, Client Data, Contacts, and company documents from Bishop.

(*Id.* at p. 10).

6.      On October 24, 2019, Bishop emailed to Condata CEO Newberry, top sales executive John Vincent and sole inside salesperson Tina Clark, an excel

spreadsheet that she, Bishop, had generated from Trans Audit's client management system containing the names and service locations of over 300 Trans Audit clients, stating: "I wanted to provide you all with a list of Trans Audit's Clients. I cannot pursue any of these entities; however, should there be any questions let me know." (Ex. 6).

7.    The same day, Bishop emailed Condata and provided "a copy of Trans Audit's Sales Presentation for you to review ..." (Ex. 7).

8.    Trans Audit did not know about Bishop's exfiltration and offloading of Trans Audit information but was beginning to discover the falsity of various representations Bishop had made to Trans Audit prior to leaving (including that she was not going to work for a competitor when in fact, she was hired by the primary direct competitor to work in a substantially similar role and that she had deleted records from her laptop). In this context, on October 25, 2019, Trans Audit sent Bishop a letter reminding her of her obligations under her contract including to return and not retain documents belonging to Trans Audit and warning her that if she failed to comply with her contract, Trans Audit intended to file suit. (Ex. 8, pp. 1-3).

9.    On November 8, 2019, Bishop circulated Trans Audit's Client List for Condata to "input in [Condata's Client Management System] HubSpot" (Ex. 9).

10.    On November 22, 2019, Defendants' shared counsel responded to Trans Audit's letter falsely claiming:

> "[w]ith regard to the confidentiality provision, as you know, *Ms. Bishop returned all Trans Audit information and property immediately after her last day of work on October 18, 2019…Ms. Bishop does not possess any Trans Audit Confidential Information and therefore cannot use or disclose any such information.*"

(Ex. 10, pp. 1-2) (emphasis supplied).

11.    On December 15, 2019, Trans Audit sent letters to both Defendants warning of the anticipated litigation. On December 27, 2019, Defendants' shared counsel replied:

> …Ms. Bishop returned all Trans Audit information and property immediately after her last day of work on October 18, 2019 and that Ms. Bishop does not possess any Trans Audit Confidential Information and therefore cannot use or disclose any such information. I also confirmed to you that Ms. Bishop has not directly or indirectly divulged, communicated, or disclosed any Trans Audit Confidential Information to any third party, including to Condata.

(Ex. 12, p. 2; *see also* Ex. 11).

12.    On January 14, 2020, Trans Audit wrote to Defendants' shared counsel explicitly addressing the obligations regarding preservation of ESI:

> Please take notice that you and your clients, Condata Global, Inc. and Kristy Bishop have an affirmative duty to preserve Electronically Stored Information ("ESI") in order to comply with federal and state law. All ESI must be preserved and retained that relates in any way to this action and any reasonably anticipated litigation.

(Ex. 13, p. 1). That letter sets forth in detail various obligations of the defendants regarding the handling of ESI relevant to this litigation, including the requirement to preserve data storage devices. *Id.* at p. 3.

13.     While defendants' shared counsel was representing to Trans Audit that they had no such information, Bishop was continuing to feed such information to Condata as later discovered.

14.     On January 17, 2020, Bishop again shared with Condata Trans Audit's Client List which she had provided to Condata on October 24, 2019 that she culled down to some 163 entities, to further highlight in color the Trans Audit clients Bishop believed Condata should be pursuing: "**Entities highlighted would be higher priority for [Condata's Sales Executive] John**." (Ex. 14).

15.     On September 29, 2020—nearly a year after leaving Trans Audit— Bishop continued to supply Condata with Trans Audit documents and information, emailing Condata CEO a list with a sample of Trans Audit client and carrier references which Trans Audit provides to specific prospective clients to solicit business. (Ex. 15).

16.     On November 24, 2020, Bishop emailed Condata a copy of "Trans Audit Sample Analytics" and promised to get "a cleaner copy" from her hard drive:

> Attached is the scanned copy of Trans Audit's analytics (apologies for the delay and state of the attachment). ***Once I pick up my hard drive, I can hopefully provide a cleaner copy of the reports.*** You can get an overview of what presented. All Trans Audit reports are exportable and most have drill down capabilities to the claim detail; something I would like for ConData to be able to achieve (claim detail visibility).

(Ex. 16) (emphasis supplied). Thus, it is indisputable that Bishop had a hard drive containing Trans Audit reports at least through November 24, 2020, and her employer Condata knew this and apparently took no action to preserve this ESI. (*Id*.)

17.     After Trans Audit brought suit against Bishop in state court, Bishop initially continued to deny she had any Trans Audit documents. Finally, in response to state court order compelling production, Bishop produced the October 24, 2019, email where she had provided Trans Audit's list of clients to Condata. (Ex. 6).

18.     On September 1, 2021, Bishop claimed in a sworn declaration that she "transferred all of my work files to a DropBox account maintained by Trans Audit." (Ex. 24 at ¶ 23).

19.     On October 8, 2021, Trans Audit again notified Defendants' shared counsel of their responsibility to preserve ESI. (Ex. 17).

20.     On November 8, 2021 (a year after her promise to produce Condata "a cleaner copy" of Trans Audit reports saved on her hard drive), Bishop responded to an interrogatory asking her to "describe the documents which were transferred or saved to [devices plugged into her company laptop] in 2019 and why" as follows:

> solely out of an abundance of caution, Bishop transferred *one document* containing a list of names of then-existing Trans Audit customers for the sole purpose of enabling her to comply with the post-employment non-solicitation provisions of her agreement with Trans Audit (i.e., to allow her to identify which customers she should not solicit)...

(Ex. 18, pp. 5-6) (e.s.). In her response to interrogatory, Bishop did not disclose, nor produce with her document production, any of the other emails or attachments she sent to Condata such as Trans Audit sales presentations, reports, sample analytics, Bishop's highlighting of Trans Audit clients she believed Condata should be pursuing, the hard drive she had identified as storing such documents, or other Trans Audit information she continued to possess. Instead, Condata later produced these with their document production in the instant case, at which point Trans Audit first became aware they even existed. *See, e.g.*, Exh's, 6, 7, 9, 14, 15, 16. Until that point, Bishop successfully kept them hidden from Trans Audit.

21.    When confronted at her November 15, 2021 deposition with the fact that Trans Audit does not maintain a DropBox account, Bishop claimed that the files were transferred to another Trans Audit folder but failed to identify the folder with any detail. (Ex. X).

22.    At her June 13, 2023, deposition in this matter, Bishop was represented by her shared counsel. Bishop was asked about the hard drive she referenced in her emails to Condata. Bishop admitted that she had "saved the report to a USB or a hard drive" which she claimed was no longer working, that she and her husband had taken it to get it repaired in the fall of 2020 but that it did not get repaired and asserted that Defendants' shared counsel's forensic expert currently had the hard drive. (Ex. 19 at

558-561). Bishop also claimed she had a paper copy of the document which she had scanned to send to Condata by email. (*Id.* at 561-64).

23.    Following this deposition, Trans Audit sent supplemental interrogatories which asked Bishop additional questions surrounding the device she claimed at her deposition could not be repaired. Despite claiming at her deposition that the hard drive was in the possession of Defendants' shared attorney's expert, Bishop responded to the interrogatories on July 21, 2023, by stating the device's current location now "is not known." (Ex. 20, p. 4).

24.    Bishop has provided no additional information on the location of this drive, how it became lost, or why Defendants' shared attorneys' expert no longer has possession of it.

25.    On August 4, 2023, Bishop maintained that out of all the devices identified by Mr. Rohr, there is only one "General USB Flash Disk USB Device" that was in her possession in October 2019 and that she "has been unable to match with any devices in her possession, custody, or control the other serial numbers listed in this interrogatory." (Ex. 21, p. 3) This USB device does not contain Trans Audit reports she emailed to Condata. There are at least two drives that are unaccounted for: a Western Digital Easy Store and a Western Digital My Passport which were last inserted on October 18, 2019, on the Trans Audit computer. (Ex. 21, pp. 10-11).

26.     Defendants' rebuttal forensic expert, Robert Fried – who admitted that he failed to conduct an impartial analysis – agreed that, due to Bishop's actions, "there's no way of knowing" what happened to data on the devices. Ex. 22

## MEMORANDUM OF LAW

### A.     LEGAL STANDARDS.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (internal quotes and citation omitted). The purpose of sanctioning such abuses is "to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (citing *Gratton v. Great American Communications*, 178 F.3d 1373, 1374 (11th Cir. 1999)).

Federal Rules of Civil Procedure 37(e) governs procedures and sanctions when a party spoliates ESI and "forecloses any reliance on inherent authority or state law to determine when certain measures should be used." Fed. R. Civ. P. 37(e) Advisory Committee's Notes to 2015 amendment. Rule 37(e) provides:

**Failure to Preserve Electronically Stored Information**.
If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

This rule "seeks to balance the centrality of electronic information to modern litigation with the almost always substantial (and sometimes unnecessary) costs of preserving electronic data." *Skanska USA Civil Se. Inc. v. Bagelheads*, *Inc.*, 2023 WL 4917108, at *32 (11th Cir. Aug. 2, 2023). By its text, Rule 37(e) creates a "two-tiered sanctions regime" with lesser sanctions under the first subsection and more severe sanctions authorized under the second. *Id.* "[C]ourts should not look to the five *Flury* factors (or, for that matter, factors from other tests in different contexts) when interpreting Rule 37(e)." *Id.* at *45, n. 18.

The two prerequisites for sanctions or curative measures for spoliation of ESI are: (1) "electronically stored information that should have been preserved in the anticipation or conduct of litigation" was "lost because a party failed to take reasonable steps to preserve it" and (2) that information "cannot be restored or

replaced through additional discovery." *Skanska USA Civil Se. Inc.*, 2023 WL 4917108, at \*32-33. If these elements are satisfied, then the court may award sanctions under subsection (e)(1) if there is a finding of "prejudice" or under subsection (e)(2) if there is a finding of "intent to deprive." *Id.*

### B.   ANALYSIS.

#### 1.   The spoliated ESI should have been preserved.

A party must preserve relevant evidence "when litigation is reasonably anticipated." *Simon Prop. Grp., Inc. v. Lauria*, 2012 WL 6859404 at \*6 (M.D. Fla. Dec. 13, 2012). That duty "must be viewed from the perspective of the party with control of the evidence[.]" *Alabama Aircraft*, 319 F.R.D. 730, 740 (N.D. Ala. 2017) (citing *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298, 301 (11th Cir. 2009)). "[I]t is an objective standard and considers whether a party should reasonably have anticipated litigation." *Nationwide Life Ins. Co. v. Betzer*, Case No. 5:18-CV-39-OC-30PRL, 2019 WL 5700288 at \*6 (M.D. Fla. Oct. 28, 2019).

The standard for whether a duty to preserve arises is essentially the same under Rule 37(e) and preexisting Eleventh Circuit precedent. *Id.* The test is whether litigation was "pending or reasonably foreseeable" when the spoliation occurred. *Id.* (citing *Graff v. Baja Marine Corp.*, 310 Fed. Appx 298, 301 (11th Cir. 2009)). "Once a party reasonably anticipates litigation, it has an obligation to make a conscientious effort to preserve electronically stored information that would be relevant." *United*

*States ex rel. King v. DSE, Inc.*, 2013 WL 610531 at *7 (M.D. Fla. Jan. 17, 2013), *report and recommendation adopted*, No. 8:08-cv-2416-T-23EAJ, 2013 WL 608541 (M.D. Fla. Jan. 15, 2014). Both "counsel and client must take some reasonable steps to see that sources of relevant information are located." *In re Seroquel Products Liab. Litig.*, 244 F.R.D. 650, 663-664 (M.D. Fla. 2007) (quotation omitted).

Given these facts, this standard is easily met. Bishop and Condata anticipated this litigation as early as September 2019 when they negotiated the joint representation agreement funded by Condata. Meanwhile, Bishop misled Trans Audit to believe she was not going to work for a competitor, allowing her two weeks of unfettered access to Trans Audit's servers during which he exfiltrate a significant amount of Trans Audit data to an external hard drive with a folder for Trans Audit email backups (TA Outlook), client data, company documents and more. Then, Bishop searched for and installed a program with the clear intention of permanently deleting her activities on her work computer so that Trans Audit would not find out what she had done. In doing so, Bishop demonstrated both legal and technical sophistication and awareness of her destruction of evidence.

Through letters dated October 25 and November 7, 2019, Trans Audit notified Bishop of its intent to litigate, and on November 22, 2019, Defendants' shared counsel acknowledged receipt of such notice. On December 19, 2019, January 14,

2020,  and October 8, 2021, Trans Audit sent additional notices of the duty to preserve ESI to Condata and Defendants' shared attorney.

Meanwhile, emails between Bishop and Condata reveal Bishop continued to have access to Trans Audit documents saved on her personal devices (which apparently were working without problem at that time) and was providing copies of those documents to Condata. In one such email dated November 24, 2020, Bishop acknowledged to Condata that she could get "cleaner copies" of Trans Audit reports from her "hard drive." (Ex. 16). Unquestionably, Bishop and Condata had a duty to preserve the ESI. These were central to the claims of whether Bishop breached her confidentiality agreement or misappropriated Trans Audit's trade secrets (as Trans Audit was warning in letters written during this time) or whether Bishop returned and no longer had any of Trans Audit's documents (as defendants' shared counsel was claiming in letters during this time). Both Defendants and their counsel were more than aware of their duties to preserve ESI. The duty to preserve relevant information including the ESI on the work computer and external devices existed even before Bishop left her employment with Trans Audit, as evidenced by Bishop's request for legal defense provided by Condata. (Ex. 15).

2.     **The spoliated ESI was lost because defendants failed to take reasonable steps to preserve it.**

The evidence was lost because defendants failed to take reasonable steps to preserve it. As explained in the advisory committee notes to Rule 37 on this issue:

"It is important that counsel become familiar with their clients' information systems and digital data-including social media-to address these issues." Fed. R. Civ. P. 37(e), Advisory Committee Notes to 2015 amendment.

Here, the information which Bishop secretly took and retained beyond her employment are central to the claims of the litigation, and Bishop not only attempted to destroy all data on her work computer, but also took no steps whatsoever to preserve her personal storage devices which also contained such information–including the eminently reasonable step of maintaining awareness of where these devices are physically located. Preservation did not impose an onerous burden in this context. To the contrary: forensic records show Bishop had no trouble exfiltrating Trans Audit data; she simply appears to have conveniently lost incriminating evidence when faced with consequences.

Bishop simply needed to maintain possession of the device(s). If she intended to get rid of any or was concerned any were "old" as she now states, she should have imaged the device(s).

Perhaps the best evidence of Bishop's complete failure to make any effort to preserve ESI is demonstrated by Bishop's ever shifting statements regarding the whereabouts of the devices and what they may have contained. Initially, shared legal counsel claimed Bishop "does not possess any" such documents (Ex. 10, p. 2). After litigation began, Bishop said she had only "one document." (Ex. 18, pp. 5-6).

Discovery from Condata revealed this to be false as well, demonstrating Bishop possessed and transmitted a number of Trans Audit documents to Condata while simultaneously representing to Trans Audit they did not exist. Condata's document production forced Bishop to change course yet again, acknowledging this "hard drive" she referenced in her email of November 2020, does in fact exist but it is in possession of defendants' shared legal counsel's forensic expert. (Ex. 19 at 558-561). Notably, neither Condata—Bishop's employer and the beneficiary of Bishop's action—nor its shared legal counsel disagreed. Weeks later, Bishop's representation changed again, and she ultimately settled on her current explanation that the hard drive's location "is not known." This hard drive is only one of the many devices Bishop plugged in to her company laptop while it was in her exclusive possession, and she cannot locate any of her other devices specifically identified by serial number by Trans Audit's forensic expert. These facts demonstrate the only "steps" Bishop, Condata and their counsel took regarding the storage devices and information were actions to prevent Trans Audit from obtaining them or even learning of their existence. It is not plausible for Bishop to claim she took "reasonable steps" to preserve those devices when they were admittedly in her possession and functioning when it suited her interests to use Trans Audit information on behalf of her new employer, and then everything is lost now that it is a liability to her. Clearly, Bishop, with support from her employer Condata and

their shared legal counsel, intended to prevent Trans Audit from obtaining any of the ESI at issue for use in this litigation.

Moreover, if one of the devices stopped working (a dubious claim given Bishop's various contradictory statements), Bishop was still obligated to preserve that nonworking hard drive and turn it over in discovery. Computer experts have means of repairing damaged hard drives and, even if not repairable, they may nevertheless be able to glean certain information from that drive notwithstanding that the files it contains are corrupted.

Critically, the evidentiary relevance of the material here is <u>not</u> the underlying substance of the computer files which must be accessed in order to be useful in this litigation (Trans Audit already has copies of its own documents stolen by Bishop) but rather the fact that Bishop *had possession of them on her personal storage devices after leaving Trans Audit's employment*. Even if files were corrupted or the drive was not working, a computer analyst may still be able to determine they had been stored on that drive.  Ascertaining certain files were on that drive would be the "smoking gun" evidence in this litigation, regardless of whether uncorrupted versions of the complete files could be accessed or read from that drive.  Due to Bishop's unilateral actions, that possibility is now lost.

Finally, when Bishop took the documents from Trans Audit servers, she used forensic software to delete her tracks and prevent anyone from seeing the full picture

of files she transferred. Bishop took intentional steps to prevent her opponent from obtaining that evidence:

> Here, the unrefuted affidavit of forensic expert Vicente Rosado establishes that the ESI contained on both Smith and Robinson's computers was lost through intentional efforts to erase data on the hard drives. This is not a case in which data was lost because it was overwritten or purged via an automatic process. Rather, the evidence suggests that Defendants manually, intentionally and systematically utilized deletion software to delete information on their hard drives. The only step necessary to preserve the evidence here would have been for Defendants to merely refrain from using the deletion software. Consequently, the second preliminary question is also answered in the affirmative.

*Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *10. The same is true here. Even without obtaining Bishop's personal hard drives or storage devices, Trans Audit would have been able to gather the relevant evidence needed for its claim (e.g., identifying the actual files Bishop surreptitiously transferred to those hard drives) from its own computer if Bishop had not taken affirmative steps to erase this evidence. She did not only cause the storage device to be lost, but she also destroyed evidence from Trans Audit's own computers which would have showed what files she copied to those storage devices.

### 3.   The ESI is not recoverable through additional discovery.

"Because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." Fed. R. Civ. P. 37(e), Advisory Committee Notes to 2015

amendment. "Courts have clarified, however, that in spoliation cases, the prejudiced party should not be held to too strict a standard of proof regarding the probable contents of the destroyed evidence 'because doing so allows the spoliators to profit from the destruction of evidence.'" *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *6 (quoting *Southeastern Mechanical Services, Inc. v. Brody*, 657 F.Supp.2d 1293, 1300 (M.D. Fla. 2009)).

There are only two possible locations which would contain the files Bishop took from Trans Audit servers: (1) the data storage devices which Bishop used to save those files, which have not been produced during years of litigation and, as of late 2023, have been claimed to be in shared counsel's expert's custody and then lost by Bishop; and (2) Trans Audit computer system records showing which files Bishop accessed and copied, but these records were manually, intentionally, and systematically erased by Bishop through her use of computer forensic software. No amount of additional discovery can obtain the information spoliated here. It is gone. The evidence has been lost through her intentional efforts, and the final prerequisite for spoliation sanctions has been met.

### 4. There is both prejudice and an intent to deprive.

a. <u>Legal Standard</u>. The court must next consider whether there is "prejudice" to the party from the loss of the information such that sanctions under subsection (e)(1) are warranted or whether harsher penalties set forth under

subsection (e)(2) are appropriate where the spoliating party acted with an "intent to deprive" their opponent of the information's use in litigation. *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *10. "There is a difference between the two findings: while a sanction (such as allowing the parties to present information and argument to the jury regarding the loss) can be imposed under subsection (e)(1) where the loss of the information is prejudicial to the party seeking it, but its loss was the result of negligence or even gross negligence, sanctions under (e)(2) can only be imposed where there is a finding that 'the party that lost the information acted with the intent to deprive another party of the information's use in the litigation.'" *Id.* (quoting Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee.) The "intent to deprive" finding can be made by the Court when ruling on a pretrial motion. *Id*. As was recently explained by the Eleventh Circuit:

> Rule 37(e)(1) sanctions are centered on the *effect* of a violation; they apply only where lost electronic evidence causes "prejudice to another party," which then justifies sanctions "no greater than necessary to cure the prejudice." Rule 37(e)(2) sanctions, on the other hand, look more to the *cause* of the violation. They require a finding that "the party acted with the intent to deprive another party of the information's use in the litigation." If so, the court is justified in imposing more severe sanctions: adverse jury instructions, and even dismissal or default judgment.

*Skanska USA Civil Se. Inc.*, 2023 WL 4917108, at *33 (emphasis in original).

      b.    <u>Prejudice</u>. With respect to subdivision (e)(1), the committee notes provide guidance on determining whether prejudice exists:

An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation. The rule does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment. "Prior to the adoption of Rule 37(e), 'prejudice' was already a critical factor in determining whether spoliation sanctions are appropriate." *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *10 (citing *McLeod v. Wal-Mart Stores, Inc.*, 515 Fed. Appx. 806, 808 (11th Cir. 2013)). The burden of establishing prejudice generally falls on the party seeking sanctions, but courts acknowledge in these situations that it can often never be proved what was contained in destroyed evidence. *Id.* "Typically, only the spoliator knows how much prejudice has been caused by the destruction." *Id.* "To require a party to show before obtaining sanctions that unproduced evidence contains damaging information would simply turn 'spoliation law' on its head." *Id.* (quoting *Brown v. Chertoff*, 563 F. Supp.2d 1372, 1379 (S.D. Ga. 2008)). Thus, a party must only come forward with plausible, concrete suggestions as to what the destroyed evidence might have been. *Id.*

Here, the spoliated evidence is central to the litigation. Bishop used her work computer to transfer troves of data from work servers to her own personal storage devices. She then used forensic software to prevent Trans Audit from determining what she took. She performed these actions on her last day of employment, immediately prior to leaving Trans Audit to work for a competitor.  Upon learning of these details (all of which Bishop had hidden from Trans Audit), Trans Audit immediately contacted her by letter to address *inter alia* her breaches of the confidentiality agreement and misappropriation of Trans Audit's trade secrets. While defendants' shared counsel claimed Bishop had no Trans Audit information or documents, Bishop was simultaneously feeding Trans Audit's information and documents to Condata by email and in doing so she expressly admitted she could obtain more Trans Audit information from her hard drive. After being sued for misappropriation of trade secrets and breach of her confidentiality agreement, these devices have suddenly gone missing. This is the quintessential example spoliations sanctions were designed to prevent, as it is "the sort of case where the unpreserved evidence clearly would have resolved a crucial issue in the case." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1308 (11th Cir. 2018) (citing *Flury*, 427 F.3d at 946). Those storage devices, if preserved, would immediately resolve this litigation. Either they would demonstrate, as Trans Audit has verified from other sources, that Bishop surreptitiously stole and retained Trans Audit

documents, or they would verify Bishop's defense to this suit that she did not do so. By destroying that evidence, the parties are now left to rely on infinitely less reliable evidence to litigate this case (e.g., Bishop's ever-shifting representations as to what files were on what device(s)), as well as the extremely limited amount of evidence from other sources revealing what was contained on those devices (e.g., Condata emails attaching and discussing the files Bishop took). If Bishop had not spoliated those device(s), these issues would not require any litigation but would be easily resolved based on a simple review of their contents. This is monumentally prejudicial to Trans Audit.

Not only will Trans Audit be prejudiced in this litigation as a result of Bishop's spoliation, Trans Audit has already suffered prejudice. In defendants' counsel letters and Bishop's discovery responses from years ago, Bishop provided false information claiming she did not possess and did not to provide to Condata any of Trans Audit's confidential information. Without access to the storage devices showing what documents Bishop did actually possess at that time, Trans Audit had no way of demonstrating she was making false statements. Until Condata produced emails and documents directly contradicting Bishop's representations (emails which Bishop did not herself produce in this litigation), Bishop could have continued making them. However, Condata's production included, as one example, an email providing a copy of "Trans Audit Sample Analytics" wherein Bishop mentions she

then had "a cleaner copy" of those reports saved on her hard drive.  Yet, before Trans Audit had these documents, it received discovery responses in this action wherein Bishop claimed she only possessed "one document" of Trans Audit which was a list of Trans Audit clients. That is now plainly false. Although Trans Audit's extensive and costly efforts in discovery have unearthed these instances of Bishop's deceit, the full extent of that deceit remains unknown due to Bishop's spoliation of evidence. She is the only one who knows what information she surreptitiously took from Trans Audit. She is the only one who knows how much Trans Audit information she stored on her personal devices. Trans Audit is doing what it can to counter Bishop's false claims and obtain contradictory evidence from outside sources showing what documents Bishop actually possessed, but it has already been prejudiced in having to litigate this case for years under the shadow of Bishop's dishonest factual assertions in discovery until eventually later pieces of information are uncovered which discredit them. Trans Audit is forced to then issue supplemental discovery, which in turn produces new inconsistent statements from Bishop, and Trans Audit must then exert additional effort and expense investigating these new claims. Bishop's bad faith in hiding this evidence necessarily requires a finding of prejudice, as provided in *Betzer*:

> Where there is evidence of bad faith in the destruction of evidence, it may be inferred that missing evidence was unfavorable and that there was prejudice. *See Southeastern Mechanical Services, Inc.*, 657 F.Supp. 2d at 1300. In making this determination, courts necessarily

consider the context of the destruction. *See Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 110 (S.D. Fla. 1987) (noting that alleged spoliator's contention that no significant prejudice resulted from destruction to be unconvincing).

*Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *10.

b.    <u>Intent to deprive</u>. Finally, more severe sanctions are permitted under subsection (e)(2) where there is an "intent to deprive." The Eleventh Circuit's recent *Skanska* opinion held that the "intent to deprive another party of the information's use in the litigation" as used in Rule 37(e)(2) is the equivalent of "bad faith" in other spoliation contexts. *Skanska USA Civil Se. Inc.*, 2023 WL 4917108, at *33.  "In this Circuit's spoliation precedents, bad faith generally means destruction [of evidence] *for the purpose of hiding* adverse evidence." *Id.* (emphasis in original). This does not require an affirmative act of the party destroying the evidence, as "failures to act can be just as harmful as affirmative acts of destruction." *Id.* at *38-39.  A district court may make an inference of bad faith where the party "took no action" and "made no effort" to preserve certain evidence even after litigation began while also making false representations that the documents were not deleted or destroyed.  *Id.* at *36-37.  Subdivision (e)(2) does not require any further finding of prejudice, as "the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position."

28

Fed. R. Civ. P. 37(e), Advisory Committee Notes to 2015 amendment.

*Skanska* addressed the loss of ESI in the form of text messages stored on employee cell phones where the employer took no steps to preserve such information and its attorney represented to the court during litigation that no documents had been lost, which ultimately proved to be false. Similar facts apply here to the loss of Bishop's personal storage devices used to save information from her Trans Audit laptop. As far back as 2019, Bishop's attorney was drafting letters to Trans Audit claiming Bishop possessed no Trans Audit documents, yet all the while Bishop was secretly providing such documents to Condata. Bishop did not turn over such information in her initial discovery responses but instead denied she had any such documents.  This was later demonstrated to be false, and she did in fact have certain Trans Audit documents as reflected in emails transmitting them to Condata. Apparently, Bishop took no action or effort to preserve that evidence during the years of litigation of this suit and currently does not even know where her hard drive is.  Bishop claimed in her June 2023 deposition, however, that the hard drive was in the possession of her attorney's forensic expert.  In July of 2023, her attorney drafted Bishop's interrogatory responses wherein she states that the hard drive's location "is not known." Furthermore, Bishop has failed to produce the many other data storage devices she connected to her Trans Audit computer while it was in her exclusive possession. However, unlike in *Skanska*, Bishop did not simply fail to take action

but employed forensic software to erase from Trans Audit computer systems the records which would have shed some light on which documents she took. There is no possible explanation for this series of events other than bad faith and an intent to deprive.

### 5.     Remedies Trans Audit is Entitled to Under Rule 37(e).

As for sanctions to cure prejudice established pursuant to subsection (e)(1), the advisory committee notes provide extensive guidance for courts:

> The range of such measures is quite broad if they are necessary for this purpose. There is no all-purpose hierarchy of the severity of various measures; the severity of given measures must be calibrated in terms of their effect on the particular case. … Much is entrusted to the court's discretion. In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies.

Fed. R. Civ. P. 37(e), advisory committee notes to 2015 amendment. In *Betzer*, the court's holding on remedies appropriate under subsection (e)(1) essentially tracked the remedies suggested in the Advisory Committee's Notes:

> As a sanction under Rule 37(e)(1) the Court could allow the parties to present evidence to the jury concerning the loss and likely relevance of information and instruct the jury that it may consider the evidence, along with all the other evidence in the case, in making its decision. *See* Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee. The Court, in allowing that presentation, could also prohibit Defendants from presenting a forensic expert to rebut Plaintiff's…

*Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *6.  While these sanctions would be appropriate under the present facts, a more severe penalty is also due.

Under subsection (e)(2) and a finding that the party acted with the intent to deprive another party of the information's use in the litigation, "the court is justified in imposing more severe sanctions: adverse jury instructions, and even dismissal or default judgment." *Skanska USA Civil Se. Inc.*, 2023 WL 4917108, at *33. In *Skanska*, the Eleventh Circuit affirmed as a sanction for losing the data stored on employee cell phones the imposition of two adverse jury instructions and an award to the movant for attorney's fees in bringing the motion.  *Skanska USA Civil Se. Inc.*, 2023 WL 4917108, at *14. Similarly in *Betzer*, the court held an adverse inference instruction was an appropriate sanction under subsection (e)(2), and further entered an award of attorney's fees. *Nationwide Life Ins. Co. v. Betzer*, 2019 WL 5700288 at *10.  Likewise, in an Alabama District Court case the court believed "firm measures" under subdivision (e)(2) were appropriate, and ordered an adverse jury instruction would be given at trial instructing the jury that it may presume the lost information was unfavorable to the party who caused it to be lost.  *Ala. Aircraft Indus. v. Boeing Co.*, 319 F.R.D. 730, 746–47 (N.D. Ala. 2017).

In the present case, this Court should enter Rule 37(e)(2) sanctions in support of Trans Audit for purposes of both the pending motions for summary judgment and for any jury trial that may be held.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests this Court grant Plaintiff's Motion for Sanctions Based on Spoliation of Evidence and, as to both pending motions for summary judgment and any trial that may be held, to:

1. allow Trans Audit to present evidence concerning the loss and likely relevance of Bishop's personal storage devices;

2. prevent Bishop and Condata from presenting any forensic expert to rebut Trans Audit's expert testimony and from presenting any evidence through their own testimony or otherwise attempting to deny that Trans Audit files were contained on those lost storage devices and dismiss or issue a default judgment on their defenses and claims that purport to require and rely on such evidence;

3. give a mandatory adverse inference jury instruction that the jury shall presume that Bishop's lost storage devices contained Trans Audit documents, confidential information, and trade secrets and that the lost information was unfavorable to the party or parties who caused it to be lost (or alternatively a non-mandatory instruction);

4. apply the same adverse inference in deciding any motion for summary judgment;

5. enter a monetary award in favor of Trans Audit for the attorney's fees expended in bringing the present Motion; and

6. grant to Plaintiff such other relief as this Court deems proper.

Respectfully submitted this 22nd day of November, 2023.

DONNELLY + GROSS

/s/ Paul A. Donnelly
PAUL A. DONNELLY, Florida Bar No. 813613
paul@donnellygross.com
/s/ Jung Yoon
JUNG YOON, Florida Bar No. 0599611
jung@donnellygross.com
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
(352) 374-4046 (facsimile)

Counsel for Plaintiff

## CERTIFICATE OF GOOD FAITH CONFERRAL

Counsel for Trans Audit certifies that the undersigned has conferred with counsel for all parties in a good-faith effort to resolve the issue raised in this Motion but has been unable to reach an agreement regarding the relief requested.

/s/ Jung Yoon

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this Motion which includes the Memorandum contains 7965 words.

/s/ Jung Yoon