# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

TRANS-AUDIT, INC.,
     Plaintiff,                   Case No. 1:22-CV-00318-RH-MAF

v.

CONDATA GLOBAL INC.
     Defendant,

and

KRISTY BISHOP,
     Intervenor.
_____/

## CONDATA GLOBAL INC. AND KRISTY BISHOP'S MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT KNEUPER AND SUPPORTING MEMORANDUM OF LAW

Under Federal Rule of Evidence 702, Defendant ConData Global Inc. and Defendant-Intervenor Kristy Bishop move to exclude the expert testimony and expert reports of Plaintiff, Trans-Audit, Inc.'s, damages expert, Dr. Robert Kneuper. In support, ConData and Ms. Bishop state as follows:

## INTRODUCTION

The Court should exclude Dr. Kneuper's expert testimony and Trans-Audit's recovery of lost profit damages for all companies identified in his supplemental expert report, including both "actual clients" and "potential clients."

First, there is no evidence that any alleged misconduct by ConData or Ms. Bishop caused Trans-Audit to lose profits regarding any of the three identified "actual clients":  Xylem, Inc., Canon, and Applied Materials, Inc. The undisputed evidence from Xylem itself is that it terminated its contract with Trans-Audit because of service issues and not because of any alleged misconduct by ConData or Ms. Bishop. Additionally, the Canon identified in Dr. Kneuper's supplemental expert report that is no longer a Trans-Audit client is Canon USA, Inc.; but the Canon entity that forms the basis for Dr. Kneuper's calculations is Canon CSA, Inc.—a Canon entity that indisputably has never been a Trans-Audit client. Finally, Applied Materials did not even become a ConData client until almost four years after Ms. Bishop left Trans-Audit—and almost two years after her restricted period ended. As such, Trans-Audit cannot establish causation for any "actual client" in Dr. Kneuper's supplemental expert report. And testimony regarding lost profits for these companies should be excluded.

Second, Trans-Audit did not have an expectation of future business from any of the "potential clients" identified in Dr. Kneuper's supplemental expert report— Best Buy Co. Inc., Kimberly-Clark Co., VF Corp., and Westrock Co. Most fundamentally and critically, it is undisputed that Trans-Audit never performed work for any of these companies, and at no point did Trans-Audit even have a counter-signed contract, or even a promise, to perform work for any of these companies,

ACTIVE:20964205.2

ever. There are also no documents or testimony evidencing these contentions. Instead, the evidence is that Trans-Audit merely hoped these prospects would someday become clients. But because aspirations do not establish a substantial relationship under Florida law, Trans-Audit's claim for lost profits fails as a matter of law and fact.

## I.   BACKGROUND

### A.   Dr. Kneuper's Lost Profits Methodology and Calculations

Dr. Kneuper is Trans-Audit's damages expert. He submitted an original expert report and a supplemental expert report calculating Trans-Audit's purported lost profits due to Defendants' alleged conduct. [Aug. 25, 2023, Kneuper Expert Report, attached as **Exhibit A**; Oct. 6, 2023, Kneuper Supplemental Expert Report, attached as **Exhibit B**].

Dr. Kneuper calculated damages for two categories of companies: "actual clients" and "potential clients." [**Ex. A**, at 2; **Ex. B**, at 2].[1] "Actual clients" were defined as companies that Trans-Audit claimed were existing Trans-Audit clients when Ms. Bishop left Trans-Audit and that became ConData clients because of the Defendants' alleged misconduct. [Oct. 17, 2023, Kneuper Depo., attached as

---

[1] ConData and Ms. Bishop have attached to this motion several exhibits that were designated as attorneys' eyes only, including several exhibits that were not the subject of Defendants' prior Motion for Leave to File Unredacted Documents, or, in the Alternative, Motion to Seal. [DE 79]. Defendants will submit hard copies of the subject exhibits to the Court for in camera review.

**Exhibit C**, at 35:20-36:2]. "Potential clients" were identified as companies that Trans-Audit claims it was "pursuing" at the time Ms. Bishop left Trans-Audit but that became clients of ConData at some later point in time. [**Ex. C**, at 35-36]. As part of his methodology, Dr. Kneuper assumed Defendants had engaged in the conduct alleged and that without the alleged misconduct, these companies would have either stayed or become clients of Trans-Audit, rather than becoming clients of ConData. [**Ex. C**, at 55-56, 67-68].

Dr. Kneuper then calculated Trans-Audit's purported historical lost profits through October 1, 2023, and future lost profits from that date extending out five years for both categories of companies. [**Ex. C**, at 36, 122].

The "actual clients" identified in Dr. Kneuper's supplemental expert report were: (1) Applied Materials, (2) Canon, and (3) Xylem. [**Ex. B**, at 9]. His calculations for alleged lost historical profits and future lost profits for these companies are summarized in Table 7 of his supplemental expert report:

### Table 7
### Lost Profits of Actual Clients

| Client | Historical Lost Profits plus PJI | Present Value of Future Lost Profits | Total Lost Profits |
|---|---|---|---|
| Applied Materials | $0 | $338,676 | $338,676 |
| Canon | $9,143 | $20,162 | $29,304 |
| Xylem | $31,496 | $46,515 | $78,011 |
| Total | $40,639 | $405,352 | $445,991 |

ACTIVE:20964205.2

The "potential clients" identified in Dr. Kneuper's supplemental expert report are: (1) VF Corp., (2) Westrock Co., (3) Kimberly-Clark Corp., and (4) Best Buy Co. Inc. [**Ex. B**, at 8].[2] His calculations for alleged lost historical profits and future lost profits for these companies are summarized in Table 6 of his supplemental expert report:

**Table 6**
**Lost Profits of Potential Clients**

| Client | Historical Lost Profits plus PJI | Present Value of Future Lost Profits | Total Lost Profits |
|---|---|---|---|
| Best Buy | $226,257 | $594,981 | $821,238 |
| Kimberly-Clark | $123,678 | $148,257 | $271,936 |
| VF Corp | $57,409 | $55,571 | $112,981 |
| WestRock | $40,245 | $43,933 | $84,177 |
| Total | $447,589 | $842,742 | $1,290,331 |

**B.      The undisputed evidence regarding the "actual clients" and "potential clients" in Dr. Kneuper's supplemental expert report**

**i.      "Actual clients"**

**1.      Xylem, Inc.**

Xylem signed a contract with Trans-Audit on April 17, 2018. [April 17, 2018 Freight & Parcel Post Audit Agreement, attached as **Exhibit D**]. The contract was not exclusive, [Aug. 16, 2023, Trans-Audit 30(b)(6) Depo., attached as **Exhibit E**,

---

[2] While Dr. Kneuper's original expert report also purported to calculate lost profits for Ross Dress for Less as a "potential client," the supplemental report does not. [**Ex. B**, at 3 n.3].

ACTIVE:20964205.2

at 315:20-316:2], and was an annual contract that automatically renewed every year unless a party gave notice of termination. [**Ex. D**]. Xylem terminated its contract with Trans-Audit on July 1, 2020. [July 1, 2020, Email, attached as **Exhibit F**].

Randy Brezler, Senior Manager of Transportation & Logistics at Xylem, made the decision to terminate the Trans-Audit contract, and he was also responsible for deciding to sign a contract with ConData in early to mid-2021. [Nov. 9, 2023, Dec. of R. Brezler, attached as **Exhibit G**, ¶ 10**;** Aug. 23, 2023 ConData Corp. Rep. Dep., attached as **Exhibit H**, at 55-56]. Before joining Xylem in 2016, Mr. Brezler had utilized ConData's post-audit services at his old firm. [**Ex. G**, ¶¶ 2-4]. After transitioning to Xylem, Mr. Brezler reached out to ConData to request its services on international shipping projects, but ConData was not interested in international work at that time. [**Ex. G**, ¶ 5]. So instead, Mr. Brezler utilized Trans-Audit. [**Ex. G**, ¶ 5].

In 2019, Mr. Brezler became dissatisfied with Trans-Audit's services because he felt the company was not capturing the savings he had previously experienced while working with ConData; he also felt Trans-Audit's communication with Xylem was insufficient. [**Ex. G**, ¶ 6]. Mr. Brezler sent a 30-day notice of cancellation to Trans-Audit on July 1, 2020, and he then responded to a prior June 11, 2020, marketing email from Ms. Clark. [**Ex. G**, ¶ 7]. By that time, ConData had been tracking Xylem since at least June 2017. [**Ex. H**, at 17:6-20; ConData00031491,

attached as **Exhibit I**].

According to Mr. Brezler himself, he made the decision to move Xylem's international and domestic post-audit work to ConData due to his dissatisfaction with Trans-Audit's services and his prior positive experience with ConData before his move to Xylem. [**Ex. G**, ¶ 10]. Mr. Brezler has no recollection or record of communicating with Ms. Bishop outside of 10 emails exchanged in January and February 2019 while she was at Trans-Audit. [**Ex. G**, ¶¶ 8-9].

### 2.     Canon – Canon USA, Inc./Canon CSA, Inc.

The generic "Canon" referenced as an "actual client" in Dr. Kneuper's supplemental expert report is not the "Canon" that had ever been a client of Trans-Audit. Canon USA signed a contract with Trans-Audit in 2015. [**Ex. A**, at 13; Dec. 8, 2015 Freight & Parcel Post Audit Agreement, attached as **Exhibit J**]. And Canon USA terminated its contract with Trans-Audit on December 2, 2021. [Dec. 2, 2021 Canon Termination Letter, attached as **Exhibit K**]. Trans-Audit admittedly does not have evidence regarding why Canon USA terminated the contract. [Aug. 11, 2023 Van Vliet Dep., attached as **Exhibit L**, at 43:12-17, 362:13-18, 365:7-16].

However, the "Canon" that Dr. Kneuper uses for his damages model in his supplemental report is Canon CSA—a related but entirely separate corporate entity from Canon USA. [**Ex. C**, at 89:17-90:7]. Indeed, while Trans-Audit had hoped to win Canon CSA's business, there is no evidence it ever signed a contract with Canon

CSA or was otherwise successful in winning its business in any manner whatsoever. [**Ex. C**, at 89-90]. Dr. Kneuper states in his supplemental expert report that "Trans Audit's contract was with Canon U.S.A. and Trans Audit was planning to expand its business to include Canon CSA before Canon moved its business to ConData." [**Ex. B**, at 5]. But there is no evidence—no contracts, communications, etc.—that Canon CSA ever planned to utilize Trans-Audit at all. Thus, at best, Canon CSA was a target of Trans-Audit, but never an actual client.

What is more, the basis for Dr. Kneuper's damages calculations for alleged lost profits for "actual client" Canon was ConData's historical revenues for Canon CSA, although the only client Trans-Audit had performed work for, and that it had actually lost, was Canon USA—an entirely different company. [**Ex. C**, at 88:21-90:1].

### 3.     Applied Materials, Inc.

Applied Materials signed a contract with Trans-Audit in 2011. [Services Agreement, attached as **Exhibit M**]. It did not have an exclusive relationship with Trans-Audit. [June 29, 2023 Kennedy Dep., attached as **Exhibit N**, at 60:21-23]. Ms. Bishop has stated she did not have any involvement with Applied Materials while she was at Trans-Audit, though Trans-Audit contends she knew Trans-Audit's primary contact and had met with the contact at some point. [Bishop Dec., attached as **Exhibit O**, ¶ 24; **Ex. N**, at 70:25-71:3]. Applied Materials terminated its contract

with Trans-Audit on May 15, 2023. [**Ex. E**, at 314; **Ex. L**, at 43]. Trans-Audit is not aware of why Applied Materials terminated the contract. [**Ex. L**, 44:1-17].

Ms. Bishop left Trans-Audit and joined ConData in October 2019. In June 2023, almost four years later, Applied Materials signed a contract with ConData. [**Ex. H**, at 54:11-14]. ConData had been pursing and/or tracking Applied Materials' business since before Ms. Bishop joined ConData, including repeatedly cold calling the company without success. [ConData Dec., attached as **Exhibit P**, ¶ 7; **Ex. H**, at 17:6-20; **Ex. I**]. Ms. Clark was repeatedly rebuffed, including in October 2020 and again in June 2022. [ConData00031419-420, attached as **Exhibit Q**; ConData00033444-45, attached as **Exhibit R**]. Finally, in September 2022—almost a year after Ms. Bishop's restricted period had ended—Applied Materials indicated it would "like to schedule an exploratory call." [ConData00033368-69, attached as **Exhibit CC**]. Applied Materials finally signed a contract with ConData nine months later, though ConData has not yet turned a profit on its Applied Materials account. [**Ex. C**, at 65:18-19].

Ms. Bishop was not involved with securing Applied Materials as a client of ConData. [**Ex. H**, at 54:21-23; **Ex. N**, at 69:11-13; **Ex. L**, 370:12-15; **Ex. O**, ¶ 24].[3]

---

[3] Trans-Audit's corporate representative speculated in conclusory terms that Ms. Bishop "could have" had indirect involvement in Applied Materials' decision to retain ConData. (**Ex. E**, at 316:3-317:11). But that speculative testimony is not based on any testimony or documents or other evidence of any kind.

And Trans-Audit admittedly has seen no evidence that Applied Materials hired ConData because of Ms. Bishop. (**Ex. E**, at 310:21-311:14; **Ex. L**, at 44:10-17).

### ii.    "Potential clients"

### 1.    Best Buy Co. Inc.

There is no evidence that Trans-Audit has ever done business with BestBuy. [**Ex. O**, ¶ 9]. During her time at Trans-Audit, Ms. Bishop never met with anyone at BestBuy. [**Ex. O**, ¶ 9]. The only evidence of her attempts to contact the company, an email produced by ConData, reflect she sent a boilerplate email on September 23, 2019 to a gentleman named Chris Ashby. [Syed Dec., attached as **Exhibit S**, at Ex. B]. That email was fruitless because, unbeknownst to Ms. Bishop, Mr. Ashby had retired from BestBuy in April 2018. [**Ex. S**, at Ex. B].

Notably, despite being asked to produce all documents relating to BestBuy in this litigation, Trans-Audit has produced zero documents reflecting communications between Trans-Audit and BestBuy at any time, ever. [**Ex. S**, ¶¶ 3-4]. By the same token, Trans-Audit was asked at its Rule 30(b)(6) deposition to identify among a list of 66 companies which companies had indicated an interest in negotiating a contract with Trans-Audit by the time Ms. Bishop had left the company. [**Ex. E**, at 399-403]. BestBuy was among the companies on the list, and yet, Trans-Audit failed to mention it at all, despite mentioning more than 10 other companies that Trans-Audit claimed it was presenting contracts to for potential work. [**Ex. E**, at 399-403].

In 2019, BestBuy submitted a request for proposals to select a post-audit provider. [**Ex. P**, ¶ 8]. At that time, ConData had been tracking BestBuy since at least June 2017. [**Ex. H**, at 17:6-20; **Ex. I**]. Three vendors bid on BestBuy's RFP, but Trans-Audit was not one of them. [**Ex. S**, at Ex. B]. ConData was selected through the RFP process in March 2020. [**Ex. P**, ¶ 8].

### 2.    Kimberly-Clark, Inc.

Trans-Audit has also never done business with Kimberly-Clark. [**Ex. O**, ¶ 9]. While she was at Trans-Audit, Ms. Bishop never met with anyone at Kimberly-Clark. [**Ex. O**, ¶ 9].

Like BestBuy, the only evidence of Ms. Bishop's attempts to even contact Kimberly-Clark while she was at Trans-Audit consists of a boilerplate email (virtually the same as the email to Mr. Ashby), produced by ConData, that she sent on September 20, 2019 to Shane Azzi, the Global Vice President of Logistics for Kimberly-Clark. [ConData00033855, attached as **Exhibit T**]. But it appears that email never made it to Mr. Azzi, given she received an error message moments later indicating the email did not reach him. [ConData00033849-51, attached as **Exhibit U**].

This email is the only evidence Dr. Kneuper references as proof Trans-Audit was "actively pursuing business with Kimberly-Clark while Kristy Bishop was

employed by Trans-Audit." [**Ex. A**, at 11]. The thinness of that contention is unsurprising. While asked in discovery to produce all documents relating to Kimberly-Clark, Trans-Audit produced zero documents reflecting communications between Trans-Audit and Kimberly-Clark, either before, during or after Ms. Bishop worked for Trans-Audit. [**Ex. S**, ¶¶ 3-4].  At its Rule 30(b)(6) deposition, Trans-Audit also failed to identify Kimberly-Clark as a company that had indicated an interest in negotiating a contract with Trans-Audit at the time Ms. Bishop left the company. [**Ex. E**, at 399-403]. This omission is all the more striking given Kimberly-Clark was among the companies on the 66-company list, and Trans-Audit identified more than 10 other companies that it was either negotiating a contract with or that Trans-Audit had otherwise presented a contract for review. [**Ex. E**, at 399-403].

ConData signed a contract with Kimberly-Clark in 2020. [**Ex. H**, at 85]. By that time, ConData had been tracking Kimberly-Clark since at least October 2017. [**Ex. H**, at 17:6-20; **Ex. I**].

### 3.    VF Corp.

Trans-Audit claims it had been soliciting VF Corp. for "quite some time"— though its corporate representative admitted it has never done business for the company. [**Ex. E**, at 322; **Ex. N**, 58:15-17].

On July 25, 2019, several months before Ms. Bishop's departure, VF Corp.

ACTIVE:20964205.2

told Trans-Audit that it "will not be exploring post-audit services in the near future." [**Ex. L**, at 297:16-20; TA008971-75, attached as **Exhibit V**, at 5]. After being rebuffed, Trans-Audit did not communicate with VF Corp. again until February 2020. [**Ex. L**, at 292:3-8, 298:1-299:11, 308:4-6]. Trans-Audit admits that at the time Ms. Bishop left the company, it had no reason to anticipate business from VF Corp. [**Ex. L**, at 301:15-18].

VF Corp. conducted a request for proposal in 2020, after Ms. Bishop left Trans-Audit. [**Ex. L**, 308:15-17]. Both ConData and Trans-Audit submitted bids for VF Corp.'s work. [**Ex. L**, at 308:15-309:22; **Ex. N**, at 58:21-59:4]. ConData had been targeting VF Corp. for multiple years at that point. [**Ex. L**, 307:21-308:17; **Ex. H**, at 17; **Ex. I**].

VF Corp. signed a contract with ConData in the summer of 2020. [**Ex. H**, at 83].[4] After Trans-Audit was not selected, Ms. Van Vliet spoke with Tara Leno from VF Corp. about the company's reasoning for selecting ConData. [**Ex. L**, at 309:10-19]. Ms. Van Vliet testified that Ms. Leno stated that the basis for the decision was a "glowing reference" from a freight audit and payment company, Cass, which

---

[4] Trans-Audit has claimed in other filings that Ms. Bishop may have disclosed its most favored nation clause information to ConData as a method to undercut it during the bidding process. [DE 86, at 19]. Putting aside that this contention is speculative, with respect to VF Corp. specifically, the record reflects VF Corp. intimated to ConData during the bidding process that it needed to at least match Trans-Audit's 30% proposal. [June 4, 2020 Email, attached as **Exhibit W**].

ACTIVE:20964205.2

"made the decision [to pick ConData] easy." [**Ex. L**, at 309:10-310:23].

Ms. Van Vliet also testified that VF did *not* state that Ms. Bishop was the reason or even a factor in VF Corp.'s decision to work with ConData. (**Ex. L**, at 311:15-312:20). While Ms. Bishop was internally listed by ConData as the primary salesperson for the VF Corp. account after the business was secured, Trans-Audit admits that, even if Ms. Bishop had never joined ConData, VF Corp. may have selected ConData as its post-auditor. [**Ex. N**, at 82:2-8].

### 4.      **Westrock Co.**

Westrock has never been a Trans-Audit client, though Trans-Audit had pursued its business since 2013. [**Ex. L**, at 330:7-332:11, **Ex. N**, at 321:24-25]. In 2016, Trans-Audit presented Westrock with a contract, but Westrock never countersigned it. [**Ex. N**, at 326; Highrise Report, attached as **Exhibit X**, at 5-7].

After 2016, there is no evidence Trans-Audit was even close to signing a contract, let alone actually performing work for Westrock, including while Ms. Bishop was at Trans-Audit. In fact, Trans-Audit's own reporting reflects many attempts to reach out to the company to solicit its work without any success, and often without even a return communication. [**Ex. X**, at 5-7].

By contrast, as of January 2019, ConData had pursued the Westrock work for years, including with unsuccessful meetings soliciting their work. [ConData00029879-80, attached as **Exhibit Y**; **Ex. L**, at 334:1-25,

ACTIVE:20964205.2

ConData00029600-04, attached as **Exhibit Z**]. In July 2020, Westrock expressed interest in retaining ConData and ultimately signed a contract in September 2020. [**Ex. P**, ¶ 9]. While she is listed in ConData's internal system as the primary salesperson for Westrock, Trans-Audit admits it does not know of Ms. Bishop being a factor in WestRock's decision to retain ConData. [**Ex. L**, 344:22-345:3].

Trans-Audit became aware of Westrock's connection to ConData in March 2021. [TA009214-15, attached as **Exhibit AA**]. In September 2021, Trans-Audit contacted Westrock and outlined its past efforts to solicit the company's business. [TA009138-9140, attached as **Exhibit BB**]. Unsurprisingly, given it had been five years since Trans-Audit had presented a contract for countersignature to the company, Trans-Audit was told that "the people [Trans-Audit] dealt with have been gone for some time." [**Ex. BB**].

## II.   MEMORANDUM OF LAW

### A.   Legal Standard

The proponent of the expert testimony bears "a substantial burden" of establishing admissibility of expert testimony under Federal Rule of Evidence 702, which must be shown by a preponderance of the evidence. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005). Rule 702 outlines four prongs for admissibility of expert testimony:

ACTIVE:20964205.2

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.   See also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (outlining "rigorous" gatekeeping function for admissibility of expert testimony); *In re SRQ Taxi Mgmt., LLC*, 8:17-BK-07782-CED, 2023 WL 473225, at *7 (Bankr. M.D. Fla. Jan. 26, 2023) (describing "thorough inquiry" and finding expert opinion on lost profits was unreliable because it was not based on sufficient facts or data).

Admissible expert testimony must be based on "more than subjective belief or unsupported speculation." *United States v. Hutchinson*, 253 F. App'x 833, 885 (11th Cir. 2007) (internal quotation marks omitted). "[A] trial court should ensure that the 'expert's testimony rests on a reliable foundation and is relevant to the task at hand.'" *Home Design Servs. Inc. v. Turner Heritage Homes Inc.*, 4:08-CV-355-SPM/WCS, 2010 WL 8685141, at *1 (N.D. Fla. July 19, 2010) (citing *Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)).

While courts can rely on the *Daubert* factors to determine whether the opinion is reliable, "[s]ometimes other questions may be more useful." *In re SRQ Taxi Mgmt., LLC*, 2023 WL 473225, at *7 (citing *Frazier*, 387 F.3d at 1262). As such,

16

"trial courts are given 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Id.* (citing *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018)).

**B.    Dr. Kneuper's "actual client" damages should be excluded because there is no evidence of causation**

The Eleventh Circuit has recognized that a plaintiff cannot recover damages for violation of a breach of a restrictive covenant where there is insufficient evidence the breach caused the former employer damage. *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1241-43 (11th Cir. 2009) (overturning damages award where there was insufficient showing breach caused plaintiff damage and no finding that absent the breach, former employer would have obtained the work).

Causation must be proven with "reasonable certainty," and "[o]ne of the reasons why injunctions are a favored remedy for breaches of restrictive covenants is that it is inherently difficult to determine what damage actually is caused by the employee's breach." *Id.* at 1243 (internal quotation marks omitted). *See also Kaplan v. Nautilus Ins. Co.,* No. 1:17-CV-24453-KMM, 2019 WL 12265654, at *13 (S.D. Fla. Nov. 4, 2019), *aff'd*, 861 F. App'x 798 (11th Cir. 2021) (precluding plaintiff from seeking certain categories of damages and its damages expert from testifying because the testimony "is unhelpful because it is based on an assumption [of causation] for which Plaintiffs provide no proof"); *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003) (finding lost profits

not recoverable where the plaintiff's "projection of lost profits [was] based on several assumptions which are not grounded on known facts, but speculation and conjecture on what might have happened," as "Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions").

There is no evidence that any breach of the restrictive covenant as to Xylem, Canon or Applied Materials caused Trans-Audit damage. And without evidence of causation, Dr. Kneuper's testimony regarding "actual clients" should be excluded.

The lack of evidence of causation is multi-faceted. There is no evidence Ms. Bishop was involved in soliciting any of these companies. [**Ex. O**, ¶ 24]. And Trans-Audit has admitted it is aware of no evidence that these companies switched to ConData because of Ms. Bishop. [**Ex. L**, at 359:5-360:4 (Xylem), 365:2-10 (Canon), 370:12-15 (Applied Materials)]. Additionally, while Ms. Bishop told ConData that each of these companies should be a target for new business, that "insight" was no news to ConData, which had been tracking and targeting each of these companies since before Ms. Bishop joined the firm, in some cases for several years. [**Ex. H**, at 17:6-20; **Ex. I**; **Ex. P**, 6].

Critically, Trans-Audit did not subpoena any of these companies to testify in this case, so there is no deposition testimony from any former client providing the basis for the decision to choose ConData. *See Proudfoot*, 576 F.3d at 1243 (noting

18

former employer chose not to call any witnesses from client and therefore the record was devoid of evidence that it "lost" the client's work at all). None of these companies produced any documents in this action, either. [**Ex. S**, ¶¶ 6-8]. And the only testimony provided from any former client was Xylem Senior Manager of Transportation & Logistics Randy Brezler's declaration, which confirmed without contradiction that he terminated Trans-Audit and hired ConData because of service-related issues. [**Ex. G**, ¶¶ 5, 10].

Dr. Kneuper's damages testimony regarding Canon should also be excluded for three additional reasons. First, Dr. Kneuper is admittedly classifying a Canon entity that was never a Trans-Audit client as an actual client, which is contrary to the undisputed evidence. Relatedly, projecting Trans-Audit's lost profits for Canon USA based on ConData's historical profits for Canon CSA is a fundamentally flawed methodology and ignores completely that lost profits have been calculated based on revenues obtained from a different company. And finally, even discarding Dr. Kneuper's own classification and construing the projections based on a classification of Canon CSA as a "potential client" fails as a matter of law and fact. As explained in more detail below in Section II.C, *infra*, Trans-Audit has produced no evidence of any kind that it had any expectation of future work from Canon CSA—including no documents, no contracts, and no concrete promise of any business whatsoever. [**Ex. C**, at 89:5-90:7]. Accordingly, Trans-Audit had no

substantial relationship with potential client Canon CSA that would permit damages recovery here.

Finally, with respect to Applied Materials, Trans-Audit's causation argument rests entirely on the premise that Applied Materials had been a Trans-Audit client, and almost four years after Ms. Bishop left, and almost two years after the restricted period had ended, Applied Materials became a ConData client. The uncontradicted evidence is that Ms. Bishop was not involved in soliciting Applied Materials for ConData, and Trans-Audit has seen no evidence ConData was hired because of Ms. Bishop. At bottom, ConData winning Applied Materials' business was simply a culmination of multiple years of pursuit of the account; the record reflects nothing more.

Accordingly, Dr. Kneuper's testimony regarding lost profits for "actual clients" should be excluded.

### C.  Trans-Audit did not have a substantial relationship with any of the "potential clients" identified in Dr. Kneuper's supplemental report; therefore, the "potential client" damages should be excluded

Because there is insufficient evidence Trans-Audit had a substantial relationship with any "potential client," the Court should exclude Dr. Kneuper's expert testimony regarding these companies.

Under Florida law, a party may not enforce a restrictive covenant unless it proves enforcement is necessary to protect a "legitimate business interest."

§ 542.335(1)(c), Fla. Stat. The company "seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." § 542.335(1)(b), Fla. Stat.

The statute defines a legitimate business interest to include, among other things, "substantial relationships with specific prospective or existing customers, patients, or clients." § 542.335(1)(b)3, Fla. Stat. The statutory requirement of a "substantial relationship" with a prospective client requires something more than an aspiration of future business. Rather, to prove a substantial relationship with a prospective client, a plaintiff must show that the client agreed to purchase plaintiff's services—not just a "mere hope" that a prospect could become a client someday:

> To the extent that POV classifies these customers as "prospective," there is no evidence that the customers considered buying or selling property with POV again. Defendants' testimony alludes to a mere hope that these customers will buy or sell with them again, but never mention an identifiable agreement or even understanding establishing that they will return. These "prospective" customers are always free to list or buy with an agent of their choosing. POV's contention, along with what it has presented, does not sufficiently establish at this time the existence of a substantial relationship.

*Props. of Villages, Inc. v. Kranz*, No. 5:19-CV-647-OC-30PRL, 2020 WL 6270932, at *6 (M.D. Fla. Aug. 14, 2020), *report and recommendation adopted,* No. 5:19-CV-647-OC-30PRL, 2020 WL 5939942 (M.D. Fla. Oct. 7, 2020) (citations omitted). *See also Head Kandy, LLC v. McNeill*, CASE NO. 23-CV-60345-RUIZ/STRAUSS, 2023 WL 6309985, at *10 (S.D. Fla. Sept. 12, 2023) (recognizing substantial

relationship requires evidence that company can reasonably expect customers to purchase product).

A substantial relationship within the meaning of the statute "is more likely to exist where there is [1] active, on-going business being conducted; [2] exclusivity; [3] a customer who cannot be easily identified by other competitors in the industry; and [4] an expectation of continued business." *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1340–41 (S.D. Fla. 2016) (citations omitted). For example, noting the plaintiff could not "read the word 'substantial' out of the statute," the court in *Pophaly* found the plaintiff had not established the existence of a substantial relationship where there was no expectation of continued business from the customer, no exclusivity of the relationship, and the customer was visible to the plaintiff's competitors. *Id.*.

Trans-Audit claims it has substantial relationships with the "potential clients" (and "actual clients")[5] identified in Dr. Kneuper's supplemental expert report. [ECF No. 1, ¶ 24; ECF No. 8, ¶ 8]. But Trans-Audit's contention fails as a matter of law and fact.

---

[5] ConData also disputes that Trans-Audit had substantial relationships with its "actual clients." As explained in ConData's motion for summary judgment, given the non-exclusive nature of the contractual relationship and the right to terminate at any time, ConData asserts Trans-Audit did not have substantial relationships with Xylem, Canon and Applied Materials under Florida law. [DE 69, at 33-34].

ACTIVE:20964205.2

The parties do not dispute that Trans-Audit has never done business with BestBuy, Kimberly-Clark, VF Corp., or Westrock or that it has never had a contract with any of these companies. [**Ex. E**, at 387:13-16, 401:12-403:15]. Trans-Audit never did work for Canon CSA, either. [**Ex. C**, at 89:17-90:7]. And only with Westrock, seven years ago, had Trans-Audit even presented a contract. [**Ex. N**, at 326:8-17]. In that instance, the contract was never countersigned, and Trans-Audit has never been able to secure work from the company since that time. [**Ex. N**, at 326:8-17; **Ex. X**, at 5-7]. Indeed, when Trans-Audit reached out to Westrock in September 2021, it evidently had such little contact with the company that its contacts had all gone stale. [6] [**Ex. X**, at 5-7; **Ex. BB**]. Under *Krantz* and *Pophaly*, these facts alone are fatal to Trans-Audit's "potential clients" damages theory.

Other undisputed facts support exclusion of the testimony. With respect to BestBuy and Kimberly-Clark, Trans-Audit's own corporate representative admitted neither company had expressed any interest in working with Trans-Audit. [**Ex. E**, at 387:13-16, 401:12-403:14]. In responding to a subpoena from ConData, BestBuy

---

[6] Whether Westrock is characterized as a true potential client or a former client by virtue of Trans-Audit presenting Westrock with the contract in 2016, Florida courts have recognized there is no substantial relationship with former clients with whom there is no evidence of an expectation of business. *See Envt'l Servs., Inc. v. Carter*, 9 So. 3d 1258, 1265 (Fla. 5th DCA 2009) (noting that "former clients are not included among the 'legitimate business interests'" outlined in section 542.335(1)(c)). Indeed, "protection of former customers generally does not qualify as a legitimate business interest where no identifiable agreement exists with such customers establishing that they would return with future work." *Id.*

ACTIVE:20964205.2

noted it never had a contractual relationship with Trans-Audit, and it has never made payments to Trans-Audit. [**Ex. S**, at Ex. B]. This testimony is consistent with other discovery in this case. Trans-Audit has not produced any documents ***whatsoever*** reflecting communications with BestBuy and Kimberly-Clark at any time, let alone substantive documentation reflecting forthcoming business. [**Ex. S**, ¶¶ 3-4]. In fact, the only documents reflecting any communication between Ms. Bishop and these two companies in the record were the two emails ConData produced reflecting Ms. Bishop's failed attempts at sending boilerplate emails in September 2019. [**Ex. S**, ¶ 5].

With respect to VF Corp. and BestBuy, the record also reflects both companies awarded their business to ConData following a competitive bidding process. [**Ex. L**, at 308:15-309:22; **Ex. S**, at Ex. B]. Trans-Audit and ConData both prepared bids for VF Corp.'s work, but VF Corp. affirmatively indicated it selected ConData because of the positive statements from Cass. [**Ex. L**, at 309:10-3:11:2; **Ex. N**, at 58:21-59:4]. Trans-Audit's corporate representative admitted in deposition that before Ms. Bishop's departure, VF Corp. had told it that it was not interested in utilizing Trans-Audit's services. [**Ex. E**, at 322:21-324:2]. And Trans-Audit did not even participate in the BestBuy request for proposal. [**Ex. S**, at Ex. B].

These facts weigh in favor of exclusion of the testimony, particularly given companies that win customers through a competitive bidding process have been

24

found to lack substantial relationships with prospective customers. *See e.g.*, *Shields v. Paving Stone Co.*, 796 So. 2d 1267, 1269 (Fla. 4th DCA 2001) ("In enjoining Shields from soliciting those customers listed on Paving Stone's customer list, the order must clearly direct that such prohibition does not include customers obtained through the open bidding process"); *Deloitte & Touche USA LLP v. Lamela*, No. CIV.A. 1542-N, 2005 WL 2810719, at *9 (Del. Ch. Oct. 21, 2005) (applying Florida law and holding prospective clients not part of preliminary injunction order where their work was put out for competitive bidding and that decision for selection was based on price).

In short, the unrefuted record is that Trans-Audit had no reasonable expectation whatsoever that any of these companies would give Trans-Audit their business. Each "potential client" identified in Dr. Kneuper's supplemental expert report represents only an aspiration or "mere hope" of business—not actual business. *See Kranz*, 2020 WL 6270932, at *6. Without evidence any of these companies were imminently bringing their work to Trans-Audit, Dr. Kneuper's testimony regarding alleged lost profits should be excluded.

## CONCLUSION

For the foregoing reasons, this Court should exclude all expert testimony and evidence regarding alleged lost profit damages for all clients identified in Dr. Kneuper's supplemental expert report.

ACTIVE:20964205.2

Respectfully submitted on January 25, 2024,

**GUNSTER, YOAKLEY & STEWART, P.A.**

By: */s/ Lauren V. Purdy*
Lauren V. Purdy, FBN 93943
lpurdy@gunster.com
awinsor@gunster.com
David M. Wells, FBN 0309291
dwells@gunster.com
dculmer@gunster.com
Asghar A. Syed, FBN 81735
asyed@gunster.com
krubin@gunster.com
1 Independent Drive, Ste. 2300
Jacksonville, FL 32202
Telephone: 904-354-1980
Facsimile: 904-354-2170

*Counsel for ConData Global Inc.*
*and Kristy Bishop*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

The undersigned certifies that this document complies with the word limitations set forth in N.D. Fla. Loc. R. 7.1(F) and contains 5,628 words, excluding the case style, signature block, and certificates of word count and service.

*/s/  Lauren V. Purdy*

26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to all counsel of record on this 25th day of January 2024.

*/s/   Lauren V. Purdy*

ACTIVE:20964205.2